UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION



FILED
JOHN P. HEHMAN
CLERK

2014 MAY -5 AM 9: 07

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| | |
|---|---|
| Nancy Goodman and Jacqueline Peiffer, | Civil No. **2 : 1 4 C V - 4** |
| Plaintiffs, | **COMPLAINT** |
| v. | Jury Trial Demanded |
| J.P. Morgan Investment Management, Inc., | JUDGE FROST |
| Defendant. | MAGISTRATE JUDGE KING |

Plaintiffs Nancy Goodman and Jacqueline Peiffer (together, "Plaintiffs") bring this action against Defendant J.P. Morgan Investment Management, Inc. ("Defendant" or "JPMIM"). Plaintiffs allege the following upon information and belief except for those allegations as to themselves, which are alleged upon personal knowledge. The allegations are based upon an investigation conducted by and through Plaintiffs' counsel, which included, *inter alia*, a review of documents filed with the Securities and Exchange Commission (the "SEC") and other public information.

## OVERVIEW OF ACTION

1.    Plaintiffs bring this action against Defendant on behalf of and for the benefit of the JPMorgan Core Bond Fund (the "Core Bond Fund"), the JPMorgan High Yield Fund (the "High Yield Fund"), and the JPMorgan Short Duration Bond Fund (the "Short Duration Bond Fund") (collectively, the "Funds") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b).

2.      Defendant is the investment adviser to the Funds and receives an annual fee from each Fund for providing investment advisory services, including managing each Fund's portfolio of assets.

3.      Under Section 36(b), Defendant owes a fiduciary duty to each Fund with respect to the investment advisory fees paid by such Fund.

4.      Defendant breached that fiduciary duty by receiving investment advisory fees from each of the Funds that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

5.      The investment advisory fee rates charged to the Funds are as much as 525% higher than the rates negotiated at arm's length by Defendant with other clients for the same or substantially the same investment advisory services.

6.      As a result of their higher fee rates, the Funds collectively pay Defendant as much as $108 million more in fees each year than they would pay for Defendant's investment advisory services had the fee arrangements been negotiated at arm's length.

7.      The Funds' investment advisory fee arrangements have enabled Defendant to retain for itself the benefits of economies of scale resulting from increases in each of the Funds' assets under management during recent years, without appropriately sharing those benefits with the Funds.

8.      The aggregate amount of investment advisory fees paid by the Funds has increased by more than 753% in recent years, from less than $22 million in fiscal year 2008 to more than $185 million in the Funds' most recently reported fiscal year ended February 28, 2013.

9. The increase in the fees paid by each of the Funds was not accompanied by a proportionate increase in the services provided by Defendant or the cost of providing investment advisory services to the Funds.

10. The increase in fees paid by each of the Funds resulted in increased profits for Defendant at the expense of the Funds.

11. Plaintiffs bring this action to recover for each of the Funds the excessive and unlawful investment advisory fees in violation of Section 36(b), as well as lost profits and other actual damages caused by each of the Funds' payment of those fees.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Section 36(b) of the 1940 Act, 15 U.S.C. § 80a-35(b).

13. This Court has jurisdiction of the claims pursuant to Sections 36(b)(5) and 44 of the 1940 Act, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

14. Venue is proper in this judicial district pursuant to Section 44 of the 1940 Act, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendant is an inhabitant of this district, maintains an office in this district, and/or transacts business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

15. Plaintiff Nancy Goodman, a resident of the State of New Jersey, is a shareholder in the Core Bond Fund and has continuously owned shares in the Core Bond Fund since at least April 2013.

3

16.     Plaintiff Jacqueline Peiffer, a resident of the State of New York, is a shareholder in the Core Bond Fund, the High Yield Fund, and the Short Duration Bond Fund, and has continuously owned shares in each Fund since at least April 2013.

17.     Defendant JPMIM is a corporation organized under Delaware law.  Defendant is a subsidiary of the global financial services firm JPMorgan Chase & Co.

18.     Defendant maintains offices within this judicial district at 1111 Polaris Parkway, Columbus, Ohio, and 8044 Montgomery Road, Cincinnati, Ohio.

## THE FUNDS' ORGANIZATION AND OPERATIONS

19.     Each of the Funds is an open-end management investment company, also known as a "mutual fund," registered under the 1940 Act.

20.     Each of the Funds is organized as a series within JPMorgan Trust II, which is a statutory trust formed under Delaware law pursuant to a Declaration of Trust, dated November 5, 2004.

21.     Like other mutual funds, the Funds are collective investments that pool money from investors and invest the money in a portfolio of securities.

22.     Each Fund issues shares to investors, such as Plaintiffs, who invest money in the Fund, and those investors become shareholders in the Fund.  Each share issued by a Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

23.     Like most other mutual funds, the Funds do not have employees or facilities of their own.  The Funds' operations are conducted by external service providers pursuant to contracts with the Funds.

4

24. Defendant serves as each Fund's investment adviser and, in that capacity, is responsible for managing each Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

25. Other service providers, including certain of Defendant's affiliates, provide other services to the Funds and their shareholders, such as communicating with shareholders about the Funds, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders.

26. The Funds are overseen by a Board of Trustees, which is responsible for selecting and monitoring the Funds' service providers, among other things.

27. The same Board of Trustees oversees each of the Funds and more than 160 other mutual funds managed by Defendant or its affiliates.

**DEFENDANT'S INVESTMENT ADVISORY SERVICES TO THE FUNDS**

28. Defendant serves as investment adviser to the Funds pursuant to an Investment Advisory Agreement (the "IAA"), initially dated August 12, 2004, and most recently amended on December 31, 2009.

29. The IAA requires Defendant to provide investment advisory services to each Fund, including: (a) "provid[ing] . . . a continuous investment program" for the Fund; (b) "investment research and management with respect to all securities and investments and cash equivalents" in the Fund's investment portfolio; (c) "determin[ing] . . . from time to time what securities and other investments will be purchased, retained or sold by the Fund"; and (d) "plac[ing] . . . orders for purchase and sale on behalf of the Fund."

30. The IAA requires Defendant to maintain certain books and records relating to its investment advisory services to each Fund.

5

31.     Each Fund's prospectus, filed with the SEC annually, provides additional information about the investment advisory services provided by Defendant to the Funds, including each Fund's investment objective, the types of securities in which each Fund invests, and the strategies employed by Defendant in managing each Fund.

**Core Bond Fund**

32.     According to the Core Bond Fund's most recent prospectus filed with the SEC on June 28, 2013 (the "Core Bond Fund Prospectus"), Defendant invests the Core Bond Fund's portfolio in the following types of securities: (a) the Fund will invest at least 80% of its portfolio in bonds; (b) the Fund principally invests in corporate bonds, U.S. treasury obligations and other U.S. government and agency securities, and asset-backed, mortgage-related and mortgage-backed securities; (c) the average weighted maturity of the Fund's bond holdings will ordinarily range between 4 and 12 years; (d) the Fund's bond holdings will be U.S. dollar-denominated; (e) the Fund's bond holdings will be rated investment grade at the time of purchase; and (f) no more than 10% of the Fund's portfolio will be invested in so-called "subprime" mortgage securities.

33.     The Core Bond Fund Prospectus further states that Defendant will employ the following investment strategies in managing the Core Bond Fund:

> The adviser buys and sells securities and investments for the Fund based on its view of individual securities and market sectors. Taking a long-term approach, the adviser looks for individual fixed income investments that it believes will perform well over market cycles.  The adviser is value oriented and makes decisions to purchase and sell individual securities and instruments after performing a risk/reward analysis that includes an evaluation of interest rate risk, credit risk, duration, liquidity and the complex legal and technical structure of the transaction.

34.     The team of JPMIM portfolio managers, research analysts, and traders who are responsible for providing investment advisory services to the Core Bond Fund is known as the Columbus Taxable Bond Team.

35.     The Columbus Taxable Bond Team is led by portfolio manager Douglas Swanson, who is principally responsible for Defendant's investment advisory services to the Core Bond Fund.

36.     Mr. Swanson and the Columbus Taxable Bond Team are based in JPMIM's office in Columbus, Ohio.

**High Yield Fund**

37.     According to the High Yield Fund's most recent prospectus filed with the SEC on June 28, 2013 (the "High Yield Fund Prospectus"), Defendant invests the High Yield Fund's portfolio in the following types of securities:  (a) the Fund will invest at least 80%, and up to 100%, of its portfolio in bonds or other debt instruments that are rated below investment grade or unrated; (b) up to 20% of the Fund's portfolio may be invested in other securities, including securities rated investment grade; (c) up to 30% of the Fund's portfolio may be invested in loans and unfunded commitments; and (d) the average weighted maturity of the Fund's bond holdings will ordinarily range between 3 and 10 years.

38.     The High Yield Fund Prospectus further states that Defendant will employ the following investment strategies in managing the High Yield Fund:

> The adviser focuses on value in buying and selling securities for the Fund by looking at individual securities against the context of broader market factors.  For each issuer, the adviser performs an in-depth analysis of the issuer, including business prospects, management, capital requirements, capital structure, enterprise value and security structure and convenants.  In addition, the adviser monitors investments on an ongoing basis by staying abreast of positive and negative credit developments expediting the

7

review of the Fund's investments that are considered to be most risky.

39.     The team of JPMIM portfolio managers, research analysts, and traders who are responsible for providing investment advisory services to the High Yield Fund is known as the Columbus/Cincinnati High Yield Team.

40.     The Columbus/Cincinnati High Yield Team is led by portfolio manager William Morgan, who is principally responsible for Defendant's investment advisory services to the High Yield Fund.

41.     Mr. Morgan and the Columbus/Cincinnati High Yield Team are based in JPMIM's office in Cincinnati, Ohio.

**Short Duration Bond Fund**

42.     According to the Short Duration Bond Fund's most recent prospectus filed with the SEC on June 28, 2013 (the "Short Duration Bond Fund Prospectus"), Defendant invests the Short Duration Bond Fund's portfolio in the following types of securities:   (a) the Fund principally invests in U.S. treasury obligations, U.S. government agency securities, corporate bonds, asset-backed securities, mortgage-backed securities, mortgage-related securities, and structured instruments; (b) securities purchased by the Fund will be rated investment grade (or the unrated equivalent) at the time of purchase; and (c) consistent with the Fund's short-duration strategy, the Fund's duration and effective average weighted maturity ordinarily will be three years or less.

43.     The Short Duration Bond Fund Prospectus further states that Defendant will employ the following investment strategies in managing the Short Duration Bond Fund:

> The adviser buys and sells securities and investments for the Fund based on its view of individual securities and market sectors.  The adviser looks for individual fixed income investments that it

8

believes will perform well over market cycles. The adviser is value oriented and makes decisions to purchase and sell individual securities and instruments after performing a risk/reward analysis that includes an evaluation of interest rate risk, credit risk, duration, liquidity and the complex legal and technical structure of the transaction.

44.     The team of JPMIM portfolio managers, research analysts, and traders who are responsible for providing investment advisory services to the Short Duration Bond Fund is known as the Short Duration Bond Team.

45.     The Short Duration Bond Team is led by portfolio manager Gregg Hrivnak, who is principally responsible for Defendant's investment advisory services to the Short Duration Bond Fund.

46.     Mr. Hrivnak and the Short Duration Bond Team are based in JPMIM's office in Columbus, Ohio.

47.     In providing investment advisory services to the Funds, Defendant must comply with the 1940 Act and related rules and regulations issued by the SEC, as well as with various provisions of federal tax law.

48.     The Columbus Taxable Bond Team, the Columbus/Cincinnati High Yield Team, and the Short Duration Bond Team are supported by a staff of legal, compliance, and administrative personnel, which is responsible for ensuring that Defendant's investment advisory services comply with applicable law, including the 1940 Act, and for maintaining books and records relating to Defendant's provision of investment advisory services to the Funds.

## INVESTMENT ADVISORY FEES
## CHARGED TO AND PAID BY THE FUNDS

49.     In exchange for the investment advisory services provided by Defendant to the Funds, the IAA requires each Fund to pay Defendant an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM."

50.     The Core Bond Fund's investment advisory fee rate is 30 basis points or 0.30% of the Fund's AUM.

51.     The Core Bond Fund paid Defendant more than $82,000,000 in investment advisory fees during fiscal year 2013.

52.     The High Yield Fund's investment advisory fee rate is 65 basis points or 0.65% of the Fund's AUM.

53.     The High Yield Fund paid Defendant more than $73,000,000 in investment advisory fees during fiscal year 2013.

54.     The Short Duration Bond Fund's investment advisory fee rate is 25 basis points or 0.25% of the Fund's AUM.

55.     The Short Duration Bond Fund paid Defendant more than $29,000,000 in investment advisory fees during fiscal year 2013.

## DEFENDANT PROVIDES THE SAME OR SUBSTANTIALLY THE SAME
## INVESTMENT ADVISORY SERVICES TO SUBADVISED FUNDS FOR LOWER FEES

56.     JPMIM provides investment advisory services to other clients.

57.     Those clients include the following mutual funds: (a) the MetLife JPMorgan Core Bond Portfolio (the "MetLife Subadvised Core Bond Fund"), (b) the Columbia Variable Portfolio JPMorgan Core Bond Fund (the "Columbia Subadvised Core Bond Fund"), (c) the Transamerica Core Bond Fund (the "Transamerica Subadvised Core Bond Fund"), (d) the LVIP

10

JPMorgan High Yield Fund (the "LVIP Subadvised High Yield Fund"), (e) the Principal High Yield Fund I (the "Principal Subadvised High Yield Fund"), (f) the AST High Yield Portfolio (the "AST Subadvised High Yield Fund"), and (g) the Pemberwick Fund (the "Subadvised Short Duration Bond Fund"). These funds are collectively referred to herein as the "Subadvised Funds."

58.     Each of the Subadvised Funds was organized and sponsored by a financial institution independent of JPMIM.

59.     Like the Funds, each of the Subadvised Funds is an open-end management investment company and is registered under the 1940 Act.

60.     Like the Funds, each of the Subadvised Funds is part of a business trust or corporation organized under state law.

61.     Like the Funds, each of the Subadvised Funds issues shares to investors who invest money in the fund, and each share represents, and may be redeemed for, a *pro rata* interest in the Subadvised Fund's underlying portfolio of securities (less any fees and other liabilities).

62.     The Subadvised Funds' financial institution sponsors nominally serve as the funds' investment advisers. They have investment advisory contracts with the funds, and receive investment advisory fees from the funds.

63.     Each of the financial institution sponsors has subcontracted with JPMIM to provide investment advisory services to the Subadvised Funds. Pursuant to subadvisory agreements between JPMIM and each of the financial institution sponsors, JPMIM acts as a so-called "subadviser" and provides investment advisory services to each Subadvised Fund in exchange for a fee.

64.     The fees that JPMIM receives for providing investment advisory services to the Subadvised Funds are paid by the financial institution sponsors of those funds.

65.     The investment advisory services that JPMIM provides as subadviser to the Subadvised Funds are the same or substantially the same as the services Defendant provides to the Funds pursuant to the IAA.

66.     The subadvisory agreements require JPMIM to provide the same or substantially the same types of investment advisory services as are required by the Funds' IAA.  For example, like the Funds' IAA, the subadvisory agreement for the MetLife Subadvised Core Bond Fund requires JPMIM to:  (a) "manage the investment and reinvestment of the portfolio assets" of the MetLife Subadvised Core Bond Fund; (b) "make all determinations with respect to the purchase and sale of portfolio securities and other financial instruments" on behalf of the MetLife Subadvised Core Bond Fund; and (c) "place orders for the execution of portfolio transactions" on behalf of the MetLife Subadvised Core Bond Fund.

67.     Like the Funds' IAA, the subadvisory agreements require JPMIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds.

**Subadvised Core Bond Funds**

68.     Defendant employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the MetLife Subadvised Core Bond Fund, the Columbia Subadvised Core Bond Fund, and the Transamerica Subadvised Core Bond Fund (collectively, the "Subadvised Core Bond Funds") as it does on behalf of the Core Bond Fund.  For example, the following chart compares the Core Bond

12

Fund's Prospectus to the most recent prospectus for the MetLife Subadvised Core Bond Fund and shows that they are substantively identical:

|  | **JPMorgan Core Bond Fund** | **MetLife Subadvised Core Bond Fund** |
|---|---|---|
| Types of Securities | at least 80% in bonds<br><br>investment grade intermediate- and long-term debt securities<br><br>principally corporate bonds, U.S. treasury obligations and other U.S. government and agency securities, and asset-backed, mortgage-related and mortgage-backed securities<br><br>average weighted maturity will ordinarily range between 4 and 12 years<br><br>U.S. dollar-denominated<br><br>no more than 10% in "sub-prime" mortgage-related securities at time of purchase | at least 80% in bonds<br><br>investment grade intermediate- and long-term debt securities<br><br>principally corporate bonds, U.S. treasury obligations and other U.S. government and agency securities, and asset-backed, mortgage-related and mortgage-backed securities<br><br>average weighted maturity will ordinarily range between 4 and 12 years<br><br>U.S. dollar-denominated<br><br>no more than 10% in "sub-prime" mortgage-related securities at time of purchase |
| Investment Strategies | "The adviser buys and sells securities and investments . . . based on its view of individual securities and market sectors."<br><br>"Taking a long-term approach, the adviser looks for individual fixed income investments that it believes will perform well over market cycles."<br><br>"The adviser is value oriented and makes decisions to purchase and sell individual securities and instruments after performing a risk/reward analysis that includes evaluation of interest rate risk, credit risk, duration, liquidity and the complex legal and technical structure of the transaction." | "JPMIM buys and sells securities and investments . . . based on its view of individual securities and market sectors."<br><br>"Taking a long-term approach, JPMIM looks for individual fixed income investments that it believes will perform well over market cycles."<br><br>"JPMIM is value oriented and makes decisions to purchase and sell individual securities and instruments after performing a risk/reward analysis that includes an evaluation of interest rate risk, credit risk, duration, liquidity and the complex legal and technical structure of the transaction." |

69. The Columbus Taxable Bond Team, led by portfolio manager Douglas Swanson, manages each Subadvised Core Bond Fund's investment portfolio.

70. The Columbus Taxable Bond Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Core Bond Funds as it uses in providing investment advisory services to the Core Bond Fund.

### Subadvised High Yield Funds

71. Defendant employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the LVIP Subadvised High Yield Fund, the Principal Subadvised High Yield Fund, and the AST Subadvised High Yield Fund (collectively, the "Subadvised High Yield Funds") as it does on behalf of the High Yield Fund. For example, the following chart compares the High Yield Fund's Prospectus to the most recent prospectus for the LVIP Subadvised High Yield Fund and shows that they are substantively identical:

| | JPMorgan High Yield Fund | LVIP Subadvised High Yield Fund |
|---|---|---|
| Types of Securities | at least 80%, and up to 100%, in bonds and other debt instruments that are rated below investment grade or unrated<br><br>up to 20% in other securities, including securities rated investment grade<br><br>up to 30% in loans and unfunded commitments<br><br>average weighted maturity will ordinarily range between 3 and 10 years | at least 80%, and up to 100%, in bonds and other debt instruments that are rated below investment grade or unrated<br><br>up to 20% in other securities, including securities rated investment grade<br><br>up to 30% in loans and unfunded commitments<br><br>average weighted maturity will ordinarily range between 3 and 10 years |

14

|  | **JPMorgan High Yield Fund** | **LVIP Subadvised High Yield Fund** |
|---|---|---|
| Investment Strategies | "The adviser focuses on value in buying and selling securities for the Fund by looking at individual securities against the context of broader market factors."<br><br>"For each issuer, the adviser performs an in-depth analysis of the issuer, including business prospects, management, capital requirements, capital structure, enterprise value and security structure and convenants."<br><br>"In addition, the adviser monitors investments on an ongoing basis by staying abreast of positive and negative credit developments expediting the review of the Fund's investments that are considered to be most risky." | "The sub-adviser focuses on value in choosing securities for the Fund by looking at individual securities against the context of broader market factors."<br><br>"For each securities issuer, the sub-adviser performs an in-depth analysis of the issuer including business prospects, management, capital requirements, capital structure, enterprise value, and security structure and covenants."<br><br>"In addition, the sub-adviser monitors investments on an ongoing basis by staying abreast of positive and negative credit developments, expediting the review of the Fund's investments that are considered to be the most risky." |

72.     The Columbus/Cincinnati High Yield Team, led by portfolio manager William Morgan, manages each Subadvised High Yield Fund's investment portfolio.

73.     The Columbus/Cincinnati High Yield Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised High Yield Funds as it uses in providing investment advisory services to the High Yield Fund.

**Subadvised Short Duration Bond Fund**

74.     Defendant employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities on behalf of the Subadvised Short Duration Bond Fund as it does on behalf of the Short Duration Bond Fund, as shown in the following chart.

| | JPMorgan Short Duration Bond Fund | Subadvised Short Duration Bond Fund |
|---|---|---|
| Types of Securities | Principally invests in U.S. treasury obligations, U.S. government agency securities, corporate bonds, asset-backed securities, mortgage-backed securities, mortgage-related securities, and structured instruments<br><br>Securities rated investment grade (or the unrated equivalent) at the time of purchase<br><br>Duration and effective average weighted maturity ordinarily will be 3 years or less. | Primarily invests in U.S. Government securities, municipal securities, commercial paper, time deposits and certificates of deposit, corporate debt obligations, and open-end investment companies<br><br>Securities rated A- or better by a nationally recognized statistical rating organization or deemed to be of comparable quality if unrated<br><br>Effective average duration generally targeted at between 1 and 3 years |
| Investment Strategies | "The adviser buys and sells securities and investments for the Fund based on its view of individual securities and market sectors."<br><br>"The adviser looks for individual fixed income investments that it believes will perform well over market cycles."<br><br>"The adviser is value oriented and makes decisions to purchase and sell individual securities and instruments after performing a risk/reward analysis that includes an evaluation of interest rate risk, credit risk, duration, liquidity and the complex legal and technical structure of the transaction." | "The Sub-Advisor selects securities by analyzing both individual securities and different market sectors . . . ."<br><br>"[The Sub-Advisor] looks for market sectors and individual securities that it believes will perform well over time."<br><br>"The Sub-Advisor selects individual securities after performing a risk/reward analysis that includes an evaluation of interest rate risk, credit risk and the complex legal and technical structure of the transaction." |

75.     The Short Duration Bond Team, led by portfolio manager Gregg Hrivnak, manages the Subadvised Short Duration Bond Fund's investment portfolio.

76.     The Short Duration Bond Team uses the same or substantially the same investment strategies, research and analysis, and systems, technology, and other resources in

16

providing investment advisory services to the Subadvised Short Duration Bond Fund as it uses in providing investment advisory services to the Short Duration Bond Fund.

77.     In providing investment advisory services to the Subadvised Funds, JPMIM must comply with the same or substantially the same provisions of the 1940 Act, SEC regulations, and federal tax law as when it provides investment advisory services to the Fund.

78.     The same or substantially the same legal, compliance, and administrative personnel are responsible for ensuring that JPMIM's investment advisory services comply with applicable law and for maintaining books and records relating to JPMIM's provision of investment advisory services to the Subadvised Funds.  They use the same or substantially the same systems, technology, and other resources in performing those tasks for the Subadvised Funds as they use for the Funds.

79.     The fees that Defendant receives for providing investment advisory services to the Subadvised Funds are lower than the fees paid by the Funds to Defendant for the same or substantially the same services.

80.     As shown in the following chart, the Core Bond Fund's investment advisory fee rate of 30 basis points on all AUM is 100% to 150% higher than the fee rates paid on behalf of the Subadvised Core Bond Funds.

| Fund | Fee Rate | Difference (%) |
|------|----------|----------------|
| JPMorgan Core Bond Fund | 0.30% on all AUM | |
| MetLife Subadvised Core Bond Fund | 0.12% on all AUM | 150% |
| Columbia Subadvised Core Bond Fund | 0.15% on all AUM | 100% |

| Transamerica Subadvised Core Bond Fund | 0.15% on AUM up to $1.5 billion; and 0.12% on AUM over $1.5 billion | 100% - 150% |
|---|---|---|

81. If the Core Bond Fund's investment advisory fees were calculated using the fee rates for the Subadvised Core Bond Funds, the Core Bond Fund would pay up to $41.4 million less in fees annually at current asset levels (approximately $23 billion in AUM), as shown in the following chart.

| Fee Schedule | Fees Paid (at $23B in AUM) | Difference ($) |
|---|---|---|
| JPMorgan Core Bond Fund | $69,000,000 | |
| MetLife Subadvised Core Bond Fund | $27,600,000 | $41,400,000 |
| Columbia Subadvised Core Bond Fund | $34,500,000 | $34,500,000 |
| Transamerica Subadvised Core Bond Fund | $28,050,000 | $40,950,000 |

82. The High Yield Fund's investment advisory fee rate of 65 basis points on all AUM is 103% to 160% higher than the fee rates paid on behalf of the Subadvised High Yield Funds.

| Fund | Fee Rate | Difference (%) |
|---|---|---|
| JPMorgan High Yield Fund | 0.65% on all AUM | |
| AST Subadvised High Yield Fund | 0.27% on all AUM if AUM are less than $1 billion; or 0.25% on all AUM if AUM are greater than $1 billion | 140% - 160% |
| Principal Subadvised High Yield Fund | 0.30% on all AUM | 116% |

| LVIP Subadvised High Yield Fund | 0.32% on all AUM | 103% |
|---|---|---|

83.     If the High Yield Fund's investment advisory fees were calculated using the fee

rates for the Subadvised High Yield Funds, the High Yield Fund would pay up to $44.0 million

less in fees annually at current asset levels (approximately $11 billion in AUM).

| Fee Schedule | Fees Paid (at $11B in AUM) | Difference ($) |
|---|---|---|
| JPMorgan High Yield Fund | $71,500,000 | |
| AST Subadvised High Yield Fund | $27,500,000 | $44,000,000 |
| Principal Subadvised High Yield Fund | $33,000,000 | $38,500,000 |
| LVIP Subadvised High Yield Fund | $35,200,000 | $36,300,000 |

84.     The Short Duration Bond Fund's investment advisory fee rate of 25 basis points

on all AUM is as much as 525% higher than the fee rate paid on behalf of the Subadvised Short

Duration Bond Fund.

| Fund | Fee Rate | Difference (%) |
|---|---|---|
| JPMorgan Short Duration Bond Fund | 0.25% on **all AUM** | |
| Subadvised Short Duration Bond Fund | 0.20% on AUM up to $50 million;<br>0.15% on AUM from $50 million to $100 million;<br>0.125% on AUM from $100 million to $200 million;<br>0.10% on AUM from $200 million to $300 million;<br>0.08% on AUM from $300 million to $500 million;<br>0.06% on AUM from $500 million to $1 billion;<br>and 0.04% on AUM over $1 billion | 25% - 525% |

85.     If the Short Duration Bond Fund's investment advisory fees were calculated using

the fee rate for the Subadvised Short Duration Bond Fund, the Short Duration Bond Fund would

pay up to $22.6 million less in fees annually at current asset levels (approximately $11 billion in AUM).

| Fee Schedule | Fees Paid (at $11B in AUM) | Difference ($) |
|---|---|---|
| JPMorgan Short Duration Bond Fund | $27,500,000 | |
| Subadvised Short Duration Bond Fund | $4,860,000 | $22,640,000 |

86. The higher fees paid by the Funds to Defendant pursuant to the IAA as set forth in the preceding paragraphs are not justified by any additional services provided to the Funds by Defendant or its affiliates.

87. Insofar as Defendant or its affiliates provide other services to the Funds, beyond the investment advisory services discussed above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid to Defendant under the IAA.

## DEFENDANT HAS NOT ADEQUATELY SHARED THE BENEFITS OF ECONOMIES OF SCALE WITH THE FUNDS

88. The Core Bond Fund's assets have increased in the past several years, with AUM growing from less than $4.5 billion as of February 29, 2008 to more than $29 billion at the end of fiscal year 2013 on February 28, 2013. Although the Core Bond Fund's AUM have declined during the current fiscal year, with more than $23 billion in AUM as of March 31, 2014, the Fund remains above historic asset levels.

89. As a result of the increase in AUM, the amount of investment advisory fees paid by the Core Bond Fund increased by more than 650%, from less than $11 million in fiscal year 2008 to more than $82 million in fiscal year 2013.

90.     The High Yield Fund's AUM increased from less than $1.8 billion as of the end of fiscal year 2008 to more than $11.3 billion at the end of fiscal year 2013. As of March 31, 2014, the Fund's AUM remained at approximately $11 billion.

91.     As a result of the increase in AUM, the amount of investment advisory fees paid by the High Yield Fund increased by more than 703%, from less than $9.2 million in fiscal year 2008 to more than $73.8 million in fiscal year 2013.

92.     The Short Duration Bond Fund's AUM increased from less than $1.7 billion as of the end of fiscal year 2008 to more than $12.3 billion at the end of fiscal year 2013. As of March 31, 2014, the Fund's AUM was approximately $11 billion.

93.     As a result of the increase in AUM, the amount of investment advisory fees paid by the Short Duration Bond Fund increased by more than 1,643%, from less than $1.7 million in fiscal year 2008 to more than $29.2 million in fiscal year 2013.

94.     The increase in investment advisory fees paid to Defendant by each Fund as detailed in the preceding paragraphs was not accompanied by a proportionate increase in the work or cost required by Defendant to provide investment advisory services to the Funds.

95.     Defendant realized economies of scale as the Funds' AUM increased, which reduced the cost, as a percentage of the Funds' AUM, of providing investment advisory services to each Fund, and increased the profitability to Defendant of providing those services.

96.     Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase.

97.     For example, the fee paid to Defendant for providing investment advisory services to the Subadvised Short Duration Bond Fund begins at 20 basis points (or 0.20%) on the first $50

21

million in AUM; then falls to 15 basis points (or 0.15%) on the next $50 million in AUM; 12.5 basis points (or 0.125%) on the next $100 million in AUM; 10 basis points (or 0.10%) on the next $100 million in AUM; 8 basis points (or 0.08%) on the next $200 million in AUM; 6 basis points (or 0.06%) on the next $500 million in AUM; and 4 basis points (or 0.04%) on AUM greater than $1 billion.

98.     Breakpoints enable a fund to share in the benefits of economies of scale by reducing the fee rate it pays as AUM increase.

99.     Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits.

100.    The Funds' investment advisory fee schedules do not include any breakpoints, and the investment advisory fee rate paid by each Fund remains the same regardless of the amount of the Fund's AUM.

101.    The investment advisory fee rates charged to and paid by the Funds have not allowed the Funds to appropriately benefit from economies of scale as the Funds' AUM have increased in recent years.

## THE FEES DEFENDANT CHARGES TO
## THE FUNDS ARE NOT NEGOTIATED AT ARM'S LENGTH

102.    The investment advisory fees paid by the Funds under the IAA are determined by Defendant.

103.    The Funds' Board of Trustees (the "Board") is required to approve the IAA and the fees paid by each Fund to Defendant under the IAA on an annual basis.

104.    The Board has approved the IAA each year without devoting the time and attention necessary to independently assess the investment advisory fees paid by each Fund or to effectively represent the interests of Fund shareholders *vis-à-vis* Defendant.

105.    Serving on the Board is a part-time job for the Trustees, most of whom are employed full-time in senior-level positions in management, finance, or academia, and/or serve on the boards of directors of other public and privately-held companies and institutions.

106.    The Board meets quarterly, and during the four meetings each year, the Board is required to conduct its oversight responsibilities not only for each of the Funds, but also for the more than 160 other JPMorgan-managed mutual funds it oversees.  This includes approving investment advisory and other services contracts for each fund, as well as other oversight responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies; overseeing the daily pricing of each fund's security holdings; and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

107.    In approving the IAA, the Board has relied on information and analyses that were prepared by Defendant or were designed to support Defendant's rationalization for the fees charged to the Funds.

108.    The Board has not considered information or analyses reflecting the interests of the Funds or their shareholders with respect to the investment advisory fees or critically assessing Defendant's rationalization for those fees.

109.    For example, with respect to the fees paid by other clients, the Board has accepted Defendant's representations that the lower fees paid by other clients reflect differences in the services provided to those clients.  The Board has not appropriately examined whether the

investment advisory services provided to those clients by Defendant are different from the services provided to the Funds under the IAA or the extent of any such differences. Nor has the Board considered appropriate information about the cost to Defendant of providing any additional services required by the IAA to assess whether the difference in fees is warranted by any such differences in the services provided.

110. The Board has approved the IAA on the terms proposed by Defendant without negotiating more favorable terms or alternative arrangements that would benefit the Funds or their shareholders.

111. The Board has not solicited proposals from other advisers to provide investment advisory services to the Funds.

112. The Board has not negotiated a "most favored nation" provision into the IAA, which would require that the fee rates paid by each of the Funds be at least as favorable as the lowest rate other clients pay JPMIM for the same or substantially the same investment advisory services.

113. The Board has approved the payment by each of the Funds of investment advisory fees that are higher than the fees other clients pay JPMIM for the same or substantially the same investment advisory services.

114. The Board has approved investment advisory fee arrangements that enable JPMIM to retain for itself the vast majority of the benefits of economies of scale resulting from increases in each of the Funds' AUM without appropriately sharing those benefits with the Funds.

24

115.    In contrast, JPMIM's fees for providing investment advisory services to the Subadvised Funds are determined by negotiations between two sophisticated financial institutions: JPMIM on the one hand and the sponsor of the Subadvised Fund on the other.

116.    The sponsors of the Subadvised Funds negotiate at arm's length with JPMIM regarding the fees paid to JPMIM for providing investment advisory services to the Subadvised Funds.

117.    The Subadvised Fund sponsors retain as profit any portion of the investment advisory fees received from the funds that remains after the sponsors pay JPMIM's subadvisory fees. By negotiating lower subadvisory fees, the Subadvised Fund sponsors increase the amount of their retained profits.

118.    The Subadvised Fund sponsors select investment advisers through a competitive selection process with multiple candidates submitting proposals.

119.    The Subadvised Fund sponsors negotiate with investment advisers regarding the fees to be charged at the outset of the relationship and when contracts are subject to renewal. The negotiations include exchanges of proposals and counterproposals resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

### THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUNDS

120.    The investment advisory fees are paid out of each Fund's assets. Each dollar in fees paid by a Fund directly reduces the value of the Fund's investment portfolio.

121.    The payment of excessive investment advisory fees to Defendant harms each of the Funds on a going forward basis because each Fund loses investment returns and profits it could earn on the amounts paid out as fees if those amounts remained in the Fund's portfolio and available for investment.

25

122. Each Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendant.

**COUNT I**
**ON BEHALF OF THE CORE BOND FUND**
**AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)**

123. Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-36, 47-51, 56-70, 77-81, 86-89, and 94-122 above as if fully set forth herein.

124. Plaintiffs assert this Count on behalf of and for the benefit of the Core Bond Fund.

125. Defendant is the investment adviser to the Core Bond Fund.

126. Under Section 36(b), Defendant owes a fiduciary duty to the Core Bond Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

127. Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Core Bond Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining

128. As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Core Bond Fund has sustained millions of dollars in damages.

129. Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Core Bond Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Core Bond Fund to Defendant and investment returns that would have accrued to the Core Bond Fund had those fees remained in the portfolio and available for investment.

130.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAA and restitution of all excessive investment advisory fees paid by the Core Bond Fund pursuant to the IAA.

## COUNT II
## ON BEHALF OF THE HIGH YIELD FUND
## AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)

131.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-31, 37-41, 47-49, 52-53, 56-67, 71-73, 77-79, 82-83, 86-87, 90-91, and 94-122 above as if fully set forth herein.

132.    Plaintiffs assert this Count on behalf of and for the benefit of the High Yield Fund.

133.    Defendant is the investment adviser to the High Yield Fund.

134.    Under Section 36(b), Defendant owes a fiduciary duty to the High Yield Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

135.    Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the High Yield Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

136.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the High Yield Fund has sustained millions of dollars in damages.

137.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the High Yield Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment advisory fees paid by the High Yield Fund to

Defendant and investment returns that would have accrued to the High Yield Fund had those fees remained in the portfolio and available for investment.

138.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAA and restitution of all excessive investment advisory fees paid by the High Yield Fund pursuant to the IAA.

**COUNT III**
**ON BEHALF OF THE SHORT DURATION BOND FUND**
**AGAINST DEFENDANT FOR VIOLATION OF SECTION 36(b)**

139.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶ 1-31, 42-49, 54-67, 74-79, 84-87, and 92-122 above as if fully set forth herein.

140.    Plaintiffs assert this Count on behalf of and for the benefit of the Short Duration Bond Fund.

141.    Defendant is the investment adviser to the Short Duration Bond Fund.

142.    Under Section 36(b), Defendant owes a fiduciary duty to the Short Duration Bond Fund with respect to its receipt of investment advisory fees and other compensation from the Fund.

143.    Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Short Duration Bond Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

144.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Short Duration Bond Fund has sustained millions of dollars in damages.

145.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Short Duration Bond Fund, the actual damages resulting from Defendant's breach of its fiduciary duty, including the excessive investment advisory fees paid by the Short Duration Bond Fund to Defendant and investment returns that would have accrued to the Short Duration Bond Fund had those fees remained in the portfolio and available for investment.

146.    Alternatively, under Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAA and restitution of all excessive investment advisory fees paid by the Short Duration Bond Fund pursuant to the IAA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of each of the Funds as follows:

A.    declaring that Defendant has violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from each Fund;

B.    permanently enjoining Defendant from further violations of Section 36(b);

C.    awarding compensatory damages against Defendant, including repayment to each Fund of all unlawful and excessive investment advisory fees paid by such Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

D.    rescinding the IAA between Defendant and the Funds pursuant to Section 47 of the 1940 Act, 15 U.S.C. § 80a-46, including restitution to each Fund of the excessive investment advisory fees paid to Defendant by such Fund

29

from one year prior to the commencement of this action through the date

of trial, lost investment returns on those amounts, and interest thereon;

E.     awarding Plaintiffs reasonable costs in this action, including attorneys'

fees, expert witness fees, and such other items as may be allowed to the

maximum extent permitted by law; and

F.     such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  May 5, 2014

**MEYER WILSON CO., LPA**

David P. Meyer (Ohio Bar #0065205)
Matthew R. Wilson (Ohio Bar # 0072925)
Michael J. Boyle, Jr. (Ohio Bar #0091162)
1320 Dublin Road, Suite 100
Columbus, OH 43215
Tel: (614) 224-6000
Fax: (614) 224-6066

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Robin F. Zwerling (*pro hac vice* to be filed)
Jeffrey C. Zwerling (*pro hac vice* to be filed)
Susan Salvetti (*pro hac vice* to be filed)
Andrew W. Robertson (*pro hac vice* to be filed)
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiffs*