**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Nancy Goodman and Jacqueline Peiffer, | Civil No. 2:14 CV-414 |
|      Plaintiffs, | Judge Frost |
| v. | Magistrate Judge King |
| J.P. Morgan Investment Management, Inc., | |
|      Defendant. | |

**PLANTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**<u>TO DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................. 1

I.    BACKGROUND REGARDING § 36(b).......................................... 4

      Legislative History.............................................................. 4

      Standard of Liability ........................................................... 6

II.   STATEMENT OF RELEVANT FACTS.......................................... 7

      Nature and Quality of JPMIM's Investment Advisory Services to the Funds ............... 7

      Fees Paid by Other Clients for JPMIM's Investment Advisory Services........................ 7

      Economies of Scale and Profitability Realized by JPMIM ............................................. 9

      Board Approval of the Advisory Fees Charged to the Funds ........................................ 11

III.  THE APPLICABLE PLEADING STANDARD .................................................... 11

IV.   RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED
      SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES
      ARE DISPROPORTIONATE TO THE SERVICES PROVIDED
      AND ARE OUTSIDE THE ARM'S-LENGTH RANGE.................................... 12

V.    DEFENDANT CHARGES ADVISORY FEES TO THE FUNDS OUTSIDE
      THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH............... 13

      A.    The Large Disparity Between the Fees Charged by Defendant to the
            JPM Funds and the Fees Charged to the Subadvised Funds Cannot Be
            Explained by Any Difference in the Investment Advisory Services. ........................ 14

            1.    The Large Disparity in Fees Charged. ............................................ 14

            2.    The Significantly Higher Fees Charged by Defendant to the JPM
                  Funds Are Not Justified by Any Meaningful Difference in the
                  Investment Advisory Services Provided........................................ 15

            3.    The Subadvised Funds' Fees Were Negotiated at Arm's Length................ 17

            4.    The Fee Comparisons to the Subadvised Funds Support a
                  Plausible Inference that the Fees Charged to the JPM Funds
                  Are Excessive.................................................................. 17

i

    B.    Defendant's Argument that the Subadvised Fund Fee
          Comparisons Are Inapt Is Contrary to Applicable Law. ........................................... 19

    C.    Plaintiffs' § 36(b) Claims Are Not Based Merely Upon a Lack of "Fee Parity" ......... 21

VI.    DEFENDANT REALIZED ECONOMIES OF SCALE AND DID NOT
       APPROPRIATELY SHARE THE BENEFITS WITH THE JPM FUNDS .................... 24

    A.    The Complaint Adequately Alleges that JPMIM Realized Economies of
          Scale and Failed to Appropriately Share the Benefits with the Funds. .................... 24

    B.    The Decrease in Assets in Fiscal Year 2014 Does Not Undermine
          Plaintiffs' Economies of Scale Allegations ............................................................ 29

VII.    APPROVAL OF THE ADVISORY FEES BY THE BOARD IS
        ENTITLED TO LITTLE OR NO DEFERENCE ............................................... 31

VIII.    RESCISSION IS AVAILABLE PURSUANT TO SECTION 47(b) ............................... 35

CONCLUSION ..................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
  2006 WL 1520222 (S.D.N.Y. May 31, 2006) ....................................................... 28

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
  464 F.3d 338 (2d Cir. 2006) ......................................................... 27, 33, 34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)) ................................................................. 11, 12, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................... 11, 29

*Curran v. Principal Mgmt. Corp.*,
  2010 WL 2889752 (S.D. Iowa June 8, 2010) ............................................... *passim*

*Daily Income Fund, Inc. v. Fox*,
  464 U.S. 523 (1984) ................................................................. 4, 5, 31

*Davis v. Bailey*,
  2005 WL 3527286 (D. Colo. Dec. 22, 2005) .................................................. 35

*Dumond v. Mass. Fin. Servs. Co.*,
  2006 WL 149038 (D. Mass. Jan. 19, 2006) ............................................... 13, 33

*In re Evergreen Mut. Funds Fee Litig.*,
  240 F.R.D. 115 (S.D.N.Y. 2007) ........................................................... 28

*In re Federated Mut. Funds Excessive Fee Litig.*,
  009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ............................................... *passim*

*Gallus v. Ameriprise Fin., Inc.*,
  675 F.3d 1173 (8th Cir. 2012) ............................................................ 33

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982) ............................................................. *passim*

*In re Goldman Sachs Mut. Funds Fee Litig.*,
  2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ......................................... 12, 13, 27, 28

*HDC, LLC v. City of Ann Arbor*,
  675 F.3d 608 (6th Cir. 2012) ............................................................. 11

*Highland Crusader Offshore Partners, L.P. v. Motient Corp.*,
   2007 WL 6926718 (W.D. Tex. Jan. 23, 2007) ....................................................... 35

*Hoffman v. UBS-AG*,
   591 F. Supp. 2d. 522 (S.D.N.Y. 2008)................................................................. 16

*In re Honda of Am. Mfg., Inc. ERISA Fees Litig.*,
   661 F. Supp. 2d 861 (S.D. Ohio 2009) ................................................................ 23

*Hunt v. Invesco Funds Group, Inc.*,
   2006 WL 1581846 (S.D. Tex. June 5, 2006) ............................................. 13, 18, 33

*Jones v. Harris Assocs. L.P.*,
   537 F.3d 728 (7th Cir. 2008) .............................................................................. 14

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010)................................................................................... *passim*

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991)....................................................................................... 5, 6

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
   2012 WL 6568409 (D.N.J. Dec. 17, 2012).................................................. *passim*

*Krinsk v. Fund Asset Mgmt. Inc.*,
   875 F.2d 404 (2d Cir. 1989)......................................................................... 23, 27

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ....................................................................... *passim*

*Mintz v. Baron*,
   2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ........................................................ 27

*Pepper v. Litton*,
   308 U.S. 295 (1939)........................................................................................ 22

*Pereira v. Farace*,
   413 F.3d 330 (2d Cir. 2005) ............................................................................... 7

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*,
   425 Fed. App'x 25 (2d Cir. 2011) ............................................................. 13, 19, 28

*Reso v. Artisan Partners Ltd. P'ship*,
   2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ............................................... *passim*

*Rhodes v. R&L Carriers, Inc.*,
   491 Fed. Appx. 579 (6th Cir. 2012)..................................................................... 11

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
  528 F. Supp. 2d 332 (S.D.N.Y. 2007)................................................................. 28

*In re Scudder Mut. Funds Fee Litig.*,
  2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ................................................... 27

*Sins v. Janus Capital Mgmt., LLC*,
  2006 WL 3746130 (D. Colo. Dec. 15, 2006)....................................... 13, 18, 30

*Strigliabotti v. Franklin Res., Inc.*,
  2005 WL 645529 (N.D. Cal. Mar. 7, 2005)................................................ 13, 30

*Turner v. Davis Select Advisers LP*,
  No. 08-CV-421, slip op. (D. Ariz. June 1, 2001)............................................. 28

*Wicks v. Putnam Inv. Mgmt., LLC*,
  2005 WL 705360 (D. Mass. Mar. 28, 2005)................................................ 13, 27

**Statutes**

15 U.S.C. § 80a-35(b) ..........................................................................*Passim*

**Rules**

Fed. R. Civ. P. 8(a) ..................................................................................... 2, 12

Fed. R. Civ. P.  8(a)(2)........................................................................................ 11

**Miscellaneous**

University of Pennsylvania's Wharton School of Finance and Commerce,
  A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962).................................. 5

*Senate Committee on Banking & Currency*,
  S. REP. NO. 184, 91st Cong., 1st Sess. (1969) ...................................... 5, 6

U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT
  MANAGEMENT, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT
  COMPANY REGULATION (May 1992) ................................................................ 25

David Swensen, *Unconventional Success*: *A Fundamental
  Approach to Personal Investment* (2005) ................................................... 24

Plaintiffs Nancy Goodman and Jacqueline Peiffer, on behalf of and for the benefit of the JP Morgan Core Bond Fund, the JP Morgan High Yield Fund, and the JP Morgan Short Duration Bond Fund (collectively, the "JPM Funds" or "Funds") respectfully submit this memorandum of law in opposition to J.P. Morgan Investment Management, Inc.'s ("Defendant" or "JPMIM") Motion to Dismiss.

## SUMMARY OF ARGUMENT

Defendant's investment advisory fee arrangements with the JPM Funds epitomize the conflicts of interest and potential for abuse that led Congress to enact § 36(b) of the Investment Company Act of 1940 (the "1940 Act"). Unconstrained by competitive pressures, Defendant charges the JPM Funds advisory fees that are as much as 525% higher than the fees negotiated at arm's length by other, independent mutual funds (the "Subadvised Funds") for the same or substantially the same advisory services. As the JPM Funds have grown to and remained at substantial asset levels, Defendant has captured the benefits of economies of scale for itself in the form of higher fees and profits, without appropriately sharing those benefits with the JPM Funds. Approval of the fees by the Funds' Board of Trustees (the "Board") has not served as an effective check on the fees charged.

In arguing that Plaintiffs' allegations are not properly pled, Defendant seeks to impose a heightened pleading standard and require far greater detail than is required by notice pleading applicable to § 36(b) claims. In short, Defendant would require Plaintiffs to *prove* their claims rather than *plead* them.

 Section I provides background regarding § 36(b) of the 1940 Act, including the legislative history and rationale behind the 1940 Act (Page 4), and the standard for liability under

§ 36(b) as articulated by the Supreme Court in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010) (Page 6).

Section II sets forth relevant facts related to the nature of the services JPMIM provides to the JPM Funds (Page 7), the fees it charges the Subadvised Funds for the same or substantially the same services (Page 7), the benefits of economies of scale that JPMIM realizes as a result of the substantial growth in the assets of the JPM Funds (without adequately sharing the benefits with the Funds) (Page 9), and the failure by the Board to serve as an effective check on the fees charge (Page 11).

Section III discusses the applicable pleading standard for a motion to dismiss under Fed. R. Civ. P. 8(a) (Page 11).

Section IV (Page 12) argues that, under *Jones,* a plaintiff may state a § 36(b) claim by alleging any combination of facts that plausibly supports an inference that a particular fee is so disproportionately large that it bears no reasonable relationship to the services rendered.  The facts alleged in this case are well within the bounds of pleading a plausible claim for relief, and numerous courts have denied motions to dismiss § 36(b) claims based on virtually identical allegations.

Section V (Page 13) argues that, under *Jones,* courts should "use the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees. *Jones*, 559 U.S. at 347.  Using this benchmark comparison, this section of the brief demonstrates why the fees charged by JPMIM are so disproportionate to the services provided and outside the range of what could be negotiated at arm's length.   Part A (Page 14) shows that (1) there is a large disparity between the investment advisory fees charged to the JPM Funds by JPMIM and the fees charged to the Subadvised Funds by JPMIM; (2) the disparity cannot be explained by

any purported differences in the services provided because JPMIM provides the same or substantially the same investment advisory services to the JPM Funds as it does to the Subadvised Funds (Page 15); (3) unlike the fees charged by JPMIM to the JPM Funds, the fees charged by JPMIM to the Subadvised Funds were the result of arm's-length negotiation (Page 17); and (4) the fee comparisons to the Subadvised Funds demonstrates the excessiveness of the fees charged to the Funds.

Part B (Page 19) shows how the comparison between the JPM Funds and the Subadvised Funds is an apt comparison, contrary to Defendant's argument, since (pursuant to *Jones*), the relevant question is what services are actually provided, not what those services are called. Defendant asks the Court to ignore this comparison and, instead, focus on comparisons with fees charged by other investment advisers to their captive mutual funds without providing any basis for why such comparisons are valid.  In fact, *Jones* cautions against exactly that type of comparison, and holds that the arm's-length range of fees for services—established here by the fees charged to the Subadvised Funds—is the benchmark for evaluating challenged fees. Similarly, Part C (Page 21) distinguishes Defendant's case law regarding "fee parity," as Plaintiff has alleged that JPMIM charges the Funds more than $100 million annually for the same or substantially the same services that it provides to the Subadvised Funds, not (as Defendant dismissively asserts) that Plaintiff "simply alleges that one fee is higher than another," Def. Br. at 2.

Section VI (Page 24) addresses Defendant's arguments regarding economies of scale. Part A (Page 24) shows how Plaintiffs have established a plausible inference that these economies accrue to Defendant, at the expense of the Funds, in the form of increased fees and profits, notwithstanding that actual proof that Defendant has realized economies of scale can

only be obtained via discovery.  This inference is not undermined by the slight decrease in assets held by the JPM Funds in 2014, as Part B (Page 29) illustrates.

Section VII (Page 31) addresses Plaintiffs' allegations that Board approval of the challenged fees should be granted little deference.

Finally, Section VIII (Page 35) shows that Plaintiffs have properly pled that the Funds are entitled to a rescissionary remedy under § 47(b) of the 1940 Act.

I.  **BACKGROUND REGARDING § 36(b)**

**Legislative History**

Congress adopted the 1940 Act to regulate investment companies, including mutual funds.  Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  *See Jones*, 559 U.S. at 338.  "The adviser selects the fund's directors, manages the fund's investments, and provides other services."  *Id*.  In this sense, a mutual fund is often referred to as "captive" of its adviser.  *Id*. at 349.  Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the 1940 Act.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted).

Congress amended the 1940 Act in 1970 to provide additional protections to shareholders with respect to the fees charged by investment advisers to their captive mutual funds.  Among other amendments, Congress added a new § 36(b), which provides:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund], or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b). Section 36(b) creates a private right of action for fund shareholders to enforce the fiduciary duty created by the statute on behalf of the fund. *See id.*

Section 36(b) reflects Congress's determination that "the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. REP. NO. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901. This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. *See* A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962) ("Wharton Report").[1] The Wharton Report determined that "investment advisers often charged mutual funds higher fees than those charged the advisers' other clients," *Daily Income Fund*, 464 U.S. at 537 (citing Wharton Report at 34), and the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds." Wharton Report at 493-94.

Section 36(b) also reflects Congress's intent to ensure that investors "share equitably . . . in the economies available as a result of the growth and general acceptance of mutual funds." S. REP. NO. 91-184, at 6 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901. Congress recognized that investment advisers realize economies of scale because "as mutual funds grew larger, it became less expensive for investment advisers to provide additional services." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001).

Finally, § 36(b) reflects Congress's conclusion that "shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (internal quotation marks and citation omitted). Congress

---

[1]     Also available at: http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

established § 36(b) as a "mechanism by which the fairness of" those fees "could be tested in court."  S. REP. NO. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

**Standard of Liability**

"[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346.  This standard of § 36(b) liability was formulated by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), and adopted by the Supreme Court. *Jones*, 559 U.S. at 346.  In applying the "*Gartenberg* standard," courts must consider "all relevant circumstances" and "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees."  *Jones*, 559 U.S. at 347.

Relevant circumstances considered by courts applying the *Gartenberg* standard include, but are not limited to:  (1) the nature and quality of services provided to the fund; (2) fees paid by others, including the adviser's other clients, for comparable services; (3) the profitability of the fund to the adviser; (4) the economies of scale realized by the adviser in providing services to the fund and the extent to which the benefits of those economies of scale have been shared with the fund; (5) any "fall-out benefits" or collateral financial benefits to the adviser from its relationship with the fund; and (6) the independence, expertise, care, and conscientiousness of the fund's board of directors in approving the challenged fees.  *See id.* at 344-45.[2]

---

[2]  In its discussion of the *Gartenberg* factors, Defendant implies that the Supreme Court's instruction that courts should consider "all relevant factors"  refers to the *Gartenberg* factors.  Def. Br. at 8.  This is not so.  Even more, Defendant conveniently ignores the sixth *Gartenberg* factor that is discussed extensively in *Jones* – board approval process.  *See id.* (listing five of the six *Gartenberg* factors cited in *Jones*).

## II.    STATEMENT OF RELEVANT FACTS

### Nature and Quality of JPMIM's Investment Advisory Services to the Funds

Defendant JPMIM serves as investment adviser to the Funds pursuant to an Investment Advisory Agreement ("IAA"), ¶ 28, which requires JPMIM to provide certain investment advisory services to each JPM Fund.[3]  Those services include: (a) "provid[ing] . . . a continuous investment program" for the Fund; (b) "investment research and management with respect to all securities and investments and cash equivalents" in the Fund's investment portfolio; (c) "determin[ing] . . . from time to time what securities and other investments will be purchased, retained or sold by the Fund"; and (d) "plac[ing] . . . orders for purchase and sale on behalf of the Fund." ¶ 29.  The IAA also requires JPMIM to maintain certain books and records. ¶ 30.

In exchange for the investment advisory services provided by JPMIM to the Funds, the IAA requires each Fund to pay JPMIM an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM." ¶ 49.

### Fees Paid by Other Clients for JPMIM's Investment Advisory Services

JPMIM also provides investment advisory services to other mutual fund clients.  ¶¶ 56-57.  These mutual funds ("Subadvised Funds") are organized and sponsored by financial institutions independent of JPMIM and nominally serve as investment advisers (the "adviser-sponsors").  ¶¶ 58, 62.  The Subadvised Funds are "independent," rather than "captive" mutual funds of Defendant.  Each of the adviser-sponsors has subcontracted with JPMIM to provide investment advisory services to its funds. ¶ 63.  Pursuant to subadvisory agreements between

---

[3]      All ¶ references are to the Complaint (Dkt. No. 1).  Defendant alludes to a challenge of the Complaint's demand for a jury trial.  Def. Br. at 7.  If, and when, Defendant moves to strike Plaintiffs' jury demand, Plaintiffs will respond in the proper course.  However, Plaintiffs seek "compensatory" damages which include lost investment returns and interest.  Accordingly, Plaintiffs are entitled to a jury trial. *See, e.g., Pereira v. Farace*, 413 F.3d 330, 340-41 (2d Cir. 2005) (holding that "defendants were entitled to a jury trial on the [plaintiff's] breach of fiduciary duty claims" where the claims were for "compensatory damages—a legal claim.").

JPMIM and each of the adviser-sponsors, JPMIM acts as a subadviser and provides investment advisory services to each of the Subadvised Funds in exchange for a fee which is paid by the adviser-sponsor.  ¶¶ 63-64.

The investment advisory services that JPMIM provides to the Subadvised Funds are the same or substantially the same as the services it provides to the JPM Funds pursuant to the IAA. ¶ 65.  For example, like the Funds' IAA, the subadvisory agreement for the MetLife Subadvised Core Bond Fund requires JPMIM to:  (a) "manage the investment and reinvestment of the portfolio assets" of the MetLife Subadvised Core Bond Fund; (b) "make all determinations with respect to the purchase and sale of portfolio securities and other financial instruments" on behalf of the MetLife Subadvised Core Bond Fund; and (c) "place orders for the execution of portfolio transactions" on behalf of the MetLife Subadvised Core Bond Fund.  *Compare* ¶ 66 *with* ¶ 29. Also, like the Funds' IAA, the subadvisory agreements require JPMIM to maintain books and records relating to its provision of investment advisory services to the Subadvised Funds. *Compare* ¶ 67 *with* ¶ 30.

For both the JPM Funds and the Subadvised Funds, JPMIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities.  ¶¶ 68, 71, 74.  The same portfolio managers and other investment professionals who manage each of the Funds also manage the corresponding Subadvised Funds. ¶¶ 69, 72, 75.  JPMIM uses the same or substantially the same research and analysis, and systems, technology, and other resources in providing investment advisory services to the Subadvised Funds as it uses in providing investment advisory services to the JPM Funds.  ¶¶ 70, 73, 76.  The same or substantially the same legal, compliance, and administrative personnel are responsible for ensuring that JPMIM's investment advisory services for both the JPM Funds and

the Subadvised Funds comply with applicable law; they are also responsible and for maintaining books and records relating to JPMIM's provision of investment advisory services to both the JPM Funds and the Subadvised Funds. ¶¶ 77-78.

Despite the virtually complete overlap in services provided, the fees that JPMIM receives for providing investment advisory services to the Subadvised Funds are significantly lower than the fees paid by the JPM Funds for those same services, resulting in the JPM Funds collectively paying more than $100 million in excessive fees in fiscal year 2013 alone. ¶¶ 79-85.

The higher fees paid by the JPM Funds pursuant to the IAA are not justified by any additional services provided to the Funds by Defendant or its affiliates. ¶ 86. To the extent Defendant or its affiliates provide other services to the JPM Funds, beyond investment advisory and administrative services, those services are provided pursuant to separate contracts for separate, additional compensation. ¶ 87.

### Economies of Scale and Profitability Realized by JPMIM

While the assets of each Fund have increased dramatically over the past several years, Defendant has benefitted from economies of scale that were not adequately shared with the Funds. From 2008-2013, the JP Morgan Core Bond Fund's AUM have increased from less than $4.5 billion to more than $29 billion. ¶ 88. This resulted in an increase in the investment advisory fees by more than 650% from $11 million to more than $85 million. ¶ 89. During the same approximate time period, the assets of the JP Morgan High Yield Fund increased from $1.8 billion to more than $11.3 billion, resulting in an increase in the investment advisory fees by more than 703% from $9.2 million to more than $73.8 million. ¶¶ 90-91. Similarly, the JP Morgan Short Duration Bond Fund's AUM increased from less than $1.7 billion to more than $12.3 billion, resulting in an increase in the investment advisory fees by more than 1,643% from $1.7 million to more than $29.2 million. ¶¶ 92-93.

The increases in advisory fees paid by each JPM Fund were not accompanied by a proportionate increase in the work or cost by JPMIM to provide investment advisory services to the Funds. ¶ 94. As a result, JPMIM realized economies of scale, which reduced the cost as a percentage of the Funds' AUM of providing investment advisory services to each Fund. ¶ 95.

Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase. ¶ 96. Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits. ¶ 99.

Here, the JPM Funds' investment advisory fee schedules include no breakpoints whatsoever. Without any breakpoints, the benefits of economies of scale accrue to Defendant because the investment advisory fee rate paid by each Fund remains the same regardless of the amount of the Fund's AUM, resulting in increased fees and profits to Defendant without any corresponding benefit to the Funds. ¶¶ 100-101. In contrast, all of the Subadvised Funds have breakpoints and/or have fee rates that are substantially lower than those paid by the Funds, thereby incorporating the benefits of economies of scale throughout the fee schedule. ¶¶ 80-85.

Although each of the Funds experienced a slight decrease in AUM during fiscal year 2014, the AUM of each Fund remain significantly above historic asset levels. ¶¶ 88-93. As a result, Defendant continues to benefit from economies of scale: Defendant continues to receive greater investment advisory fees due to the Funds' higher levels of AUM (relative to historic asset levels), but the cost of providing investment advisory services remains essentially unchanged. ¶¶ 94-95. Because the investment advisory fee rates charged to the Fund have not been reduced through breakpoints or otherwise, Defendant continues to capture the benefits of

10

those economies of scale in the form of greater profits, without appropriately sharing those benefits with the JPM Funds.  ¶¶ 99-101.

### Board Approval of the Advisory Fees Charged to the Funds

The Funds' Board has approved the IAA each year without devoting the time and attention necessary to assess the advisory fees charged to the Funds.  ¶ 104.  The Board passively accepted JPMIM's rationalization for the fees charged and did not appropriately examine, among other things, the disparity between fees charged to the JPM Funds and to the Subadvised Funds or any purported justification for such disparity.  ¶¶ 107-114.

## III.   THE APPLICABLE PLEADING STANDARD

Fed. R. Civ. P. 8 governs the pleading sufficiency of a § 36(b) claim.  *See, e.g., Migdal*, 248 F.3d at 326-27.  Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

"'[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,' however, it must assert sufficient facts to provide the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Rhodes v. R&L Carriers, Inc.*, 491 Fed. Appx. 579, 582 (6th Cir. 2012) (alterations in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "To satisfy Rule 8(a)(2) and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Sixth Circuit "has cautioned against reading '*Twombly* and *Iqbal* so narrowly as to be the death of notice pleading....'"  *Rhodes*, 491, Fed.Appx. at 583 (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012).  A plaintiff's complaint must simply "plead factual content that allows the court to draw the reasonable inference that defendant is liable for

the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). When reviewing a motion to dismiss on the pleadings, a district court must "construe the complaint in the light most favorable to the non-moving party and accept all factual allegations as true." *McGlone v. Bell*, 681 F.3d 718, 731 (6th Cir. 2012).

## IV. RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE SERVICES PROVIDED AND ARE OUTSIDE THE ARM'S-LENGTH RANGE

Under § 36(b), the inquiry at the pleading stage is whether Plaintiffs "allege facts which would satisfy the basic standard articulated in *Gartenberg*, 'that the fees are disproportionately large, that they bear no reasonable relationship to the services rendered or that they could not have been the product of arm's-length bargaining.'" *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (citation omitted); *see also Jones*, 559 U.S. at 351.

Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *Curran v. Principal Mgmt. Corp.*, No. 4:09-cv-00433, 2010 WL 2889752, at *9 (S.D. Iowa June 8, 2010).[4] Contrary to Defendant's attempt to transform the *Gartenberg* factors into pleading requirements, those factors, while pertinent, are "non-exclusive." *See In re Federated Mut. Funds Excessive Fee Litig.*, No. 2:04-cv-352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009). That is, Plaintiffs are ***not*** required to plead facts with respect to all of the *Gartenberg* factors. *See Kasilag v. Hartford Inv. Fin. Servs., LLC,* No. 11-1083, 2012 WL 6568409, at *2 (D.N.J. Dec. 17, 2012);

---

[4]  In arguing that Plaintiffs fail to set forth "a cogent legal theory" (Def. Br. at 1), Defendant distorts the applicable pleading standard under § 36(b).

*Curran,* 2010 WL 2889752, at *9; *Reso v. Artisan Partners Ltd. P'ship,* No. 11-CV-873, 2011 WL 5826034, at *5 (E.D. Wis. Nov. 18, 2011).  Defendant's authority recognizes as much.  *See In re Goldman Sachs,* 2006 WL 126772, at *8.

Courts throughout the country have regularly denied motions to dismiss § 36(b) claims founded upon allegations similar to those here, as further discussed herein.  *See, e.g., R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 Fed. Appx. 25 (2d Cir. 2011); *Kasilag,* 2012 WL 6568409; *In re Federated,* 2009 WL 5821045; *Reso,* 2011 WL 5826034; *Curran,* 2010 WL 2889752; *Sins v. Janus Capital Mgmt., LLC*, No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc.,* No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.,* No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC*, No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005); *Strigliabotti v. Franklin Res., Inc.,* No. C 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005).

## V. DEFENDANT CHARGES ADVISORY FEES TO THE FUNDS OUTSIDE THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH

The Supreme Court in *Jones* held that courts considering claims under § 36(b) must "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.  The Supreme Court further explained that the fees paid by the adviser-defendant's other clients should be given "the weight that they merit in light of the ***similarities and differences between the services*** that the clients in question require . . . ." *Id.* at 350 (emphasis added).  The fees paid by other clients are probative of a breach of fiduciary duty under § 36(b) "where plaintiffs have shown a large disparity in fees that cannot be explained by the different services" provided to other clients. *Id.* at 350 n.8.

13

The Supreme Court emphasized that, in order to be probative under § 36(b), the fees used as comparison points must have been the result of negotiations conducted at arm's-length. *Id.* at 350-51. *Jones* cautioned that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers." *Id.* at 350. "These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length." *Id.* at 350-351 (citing *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 732 (7th Cir. 2008) (Posner, J., dissenting).

A. **The Large Disparity Between the Fees Charged by Defendant to the JPM Funds and the Fees Charged to the Subadvised Funds Cannot Be Explained by Any Difference in the Investment Advisory Services.**

Consistent with *Jones*, Plaintiffs have alleged that: (1) there is a large disparity between the investment advisory fees charged to the JPM Funds by JPMIM and the fees charged to the Subadvised Funds for JPMIM's investment advisory services; (2) the disparity cannot be explained by any purported differences in the services provided because JPMIM provides the same or substantially the same investment advisory services to the JPM Funds and to the Subadvised Funds; and (3) the fees charged by JPMIM to the Subadvised Funds were the result of arm's-length negotiations. These allegations address the *Gartenberg* factors pertaining to the nature and quality of the services provided and comparative fee structures.

1. **The Large Disparity in Fees Charged.**

Plaintiffs allege that the fees charged to the JPM Funds for Defendant's investment advisory services are disproportionately higher than the fees charged by Defendant to the Subadvised Funds for the same or substantially the same services. *See* ¶¶ 4, 56-87. The fee rates charged by Defendant to the Funds are as much as 525% higher than the fee rates charged by Defendant to the Subadvised Funds. *See* ¶ 84. The difference in fees is even more pronounced

14

in dollars paid, with the Funds collectively paying as much as $108 million more in fees per year for Defendant's investment advisory services than they would pay pursuant to the fee schedules of the Subadvised Funds. *See* ¶¶ 80-85.

### 2. The Significantly Higher Fees Charged by Defendant to the JPM Funds Are Not Justified by Any Meaningful Difference in the Investment Advisory Services Provided.

As JPMIM provides the same or substantially the same investment advisory services to the JPM Funds and to the Subadvised Funds, there is no justification for charging the significantly higher fee to its captive funds.[5] *See* ¶¶ 56-78, 87. As an example, the Funds' IAA and a Subadvised Fund's subadvisory agreement both require JPMIM to provide the same or substantially the same types of investment advisory services. *Compare* ¶ 29 *with* ¶ 66. The significantly higher fees charged to the JPM Funds, therefore, cannot be explained by any meaningful difference in JPMIM's investment advisory services. ¶ 86.

The disclosures in the prospectuses of the Funds and the Subadvised Funds also show that the services are substantively identical. Defendant employs substantially the same investment strategies and invests in substantially the same types of securities for both the Funds and the Subadvised Funds. ¶¶ 68-76. The same portfolio managers and other investment professionals are involved in providing investment advisory services to both sets of funds, and use the same research and analysis, systems, technology, and other resources. *See* ¶¶ 69, 72, 75, 78. Finally, because both the Funds and the Subadvised Funds are mutual funds registered under

---

[5] Although Defendant persists in characterizing the Complaint's allegations of the services provided as being "similar" (*see, e.g.*, Def. Br. at 1, 10, 12), the well-pled facts are that the services provided by Defendant are "the same or substantially the same." *See, e.g.*, ¶¶ 65, 66, 69, 70, 71, 73, 74, 76, 78, 79. However, even allegations of "similar" services have been found to be sufficient. *See, e.g., Reso*, 2011 WL 5826034, at *3 (finding plaintiff's allegation that defendant charges less for providing "similar services to all the funds it manages" satisfies the comparative fee structure of *Gartenberg*).

the 1940 Act, *see* ¶ 59, the same laws and regulations govern JPMIM's provision of investment advisory services to both sets of funds, *see* ¶ 77.

Defendant's argument that it "has a more limited role" when serving as a subadviser because it "provide[s] services under the supervision of the Subadvised Funds' investment advisers," Def. Br. at 12, flies in the face of the express terms of the Subadvised Funds' agreements.  Those agreements require Defendant to provide the same or substantially the same services to the Subadvised Funds as it provides to the JPM Funds, notwithstanding any purported oversight by the adviser-sponsors of the Subadvised Funds.  ¶ 66.

Moreover, Defendant is likewise subject to supervision when providing services to the JPM Funds.   Just as it provides services to the Subadvised Funds under the supervision of the adviser-sponsors to those funds, Defendant provides services to the JPM Funds under the supervision of the Board.  *See* Declaration of Jonathan E. Goulart (Dkt. No. 13) Ex. C at 3 ("***Subject to the supervision of the Fund's Board of Trustees***, the Investment Adviser will provide . . . a continuous investment program . . . .") (emphasis added).  Defendant fails to explain how the supervision of it by either the Board or the adviser-sponsor in any way impacts the investment advisory services it performs.  At most, Defendant's argument that it performs a "more limited role" for the Subadvised Funds raises a merits issue that cannot be resolved on a motion to dismiss.  *See Kasilag*, 2012 WL 6568409, at *3 (citing *Curran*, 2010 WL 2889752, at *9).

Finally, Defendant's reliance on *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) is misplaced because the plaintiffs in *Hoffman* ***acknowledged in their Complaint*** that advisers and subadvisers "perform[ed] ***distinct*** services."  *See Hoffman,* 591 F. Supp. 2d. at 540 (emphasis added).  In stark contrast, Plaintiffs here allege that JPMIM provides

16

the same or substantially the same services as investment adviser to the Funds and as subadviser to the Subadvised Funds.  ¶¶ 56-79.

### 3.   The Subadvised Funds' Fees Were Negotiated at Arm's Length.

Defendant does not contest that the fees charged by JPMIM to the Subadvised Funds were the result of arm's-length negotiations.  The adviser-sponsors of the Subadvised Funds select investment advisers, such as JPMIM, through a competitive selection process (¶ 118), and they negotiate at arm's-length with JPMIM and other investment advisers regarding the fees charged to provide investment advisory services to the Subadvised Funds (¶ 116), including exchanging proposals and counterproposals and seeking reductions in the fee rates charged (¶ 119).

The results of those arm's-length negotiations is that JPMIM charges fees to the Subadvised Funds that are significantly lower than those it charges to the Funds.  Inasmuch as the Subadvised Funds' fees are negotiated at arm's length and are not lower due to any meaningful difference in the  advisory services provided by JPMIM, the subadvised fees provide the range of fees that could be negotiated at arm's length for JPMIM's investment advisory services.  *See Jones*, 559 U.S. at 349.

### 4.   The Fee Comparisons to the Subadvised Funds Support a Plausible Inference that the Fees Charged to the JPM Funds Are Excessive.

That the Funds, captive to JPMIM, pay as much as 525% higher fees for advisory services than the independent Subadvised Funds pay for the same or substantially the same services supports the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for JPMIM's advisory services.  *See Jones*, 559 U.S. at 350 & n.8.

17

Numerous courts—both before and after *Jones*—have denied motions to dismiss § 36(b) claims where plaintiffs asserted that the adviser-defendant charged lower fees to other clients for the same or substantially the same investment advisory services. *See, e.g.*, *Reso*, 2011 WL 5826034, at *8 (comparing fees charged by defendant to other funds that it managed for providing "similar services" and holding that the higher fees charged to the captive funds "give rise to the inference that [defendant] has comparatively over-charged the funds in this case."); *In re Federated*, 2009 WL 5821045, at *6-7 (denying motion to dismiss where complaint alleged, *inter alia*, that defendants provide the same advisory services to other clients, who are able to negotiate at arm's-length, for substantially lower fees); *Hunt*, 2006 WL 1581846, at *3 (holding that "[t]his Court agrees with other district courts that have found such allegations, that investment managers charge fund shareholders higher fees than other clients for equivalent advisory services, to be indicative of a disproportionate relationship between fees and service."); *Sins*, 2006 WL 3746130, at *3 (finding that "Plaintiffs have alleged that Defendant provides identical services to third parties at a lower cost, which would indicate a disparity").

Courts have also denied motions to dismiss in analogous cases where an investment adviser charged its captive funds an advisory fee rate substantially higher than the fee rate paid to an independent subadviser to perform the same or substantially the same services. *See, e.g.*, *Kasilag*, 2012 WL 6568409, at *3 (where plaintiffs alleged that defendant charged the funds an average of three times what it cost to provide "essentially the same investment management services" a plausible inference that the fees are excessive under § 36(b) was raised); *Curran*, 2010 WL 2889752, at *9 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support the reasonable inference that adviser collected excessive advisory fees).

18

In another analogous situation, the Second Circuit had "little trouble concluding" that plaintiffs had adequately alleged a claim under § 36(b) where defendant charged its captive funds a transfer agency fee that was significantly higher than the rate it negotiated at arm's length with an unaffiliated entity to provide transfer agency services.  *R.W. Grand Lodge*, 425 Fed. Appx. at 30.  The court held that "the transfer agent arrangement . . . constitutes a garden variety breach of fiduciary duty" and stated a claim under § 36(b) because "Defendants knowingly inflated the price of the transfer agent services provided to Plaintiffs and pocketed the difference between what they charged and what the services were worth."  *Id.* at 30-31.  Plaintiffs here make essentially the same allegation based on the Subadvised Fund fee comparisons.

### B.  Defendant's Argument that the Subadvised Fund Fee Comparisons Are Inapt Is Contrary to Applicable Law.

Defendant attempts to brush aside the Subadvised Fund fee comparisons as "inapt" because of mere nomenclature:  that is, the JPM Funds pay what is called an "advisory fee" and the Subadvised Funds pay what is called a "subadvisory fee."  Def. Br. at 11-14.  But this is a distinction without a difference.  The fact is, regardless of whether JPMIM is denominated as an adviser or subadviser, Plaintiffs allege that it provides the same or substantially the same investment advisory services.  That is what matters.  *See Jones*, 559 U.S. at 350 (fee comparisons should be given "the weight that they merit in light of the similarities and differences ***between the services*** that the clients in question require" (emphasis added)).

Comparisons between advisory and subadvisory fees are probative of a claim under § 36(b) where, as here, the services provided in exchange for each fee are alleged to be comparable.  *See Kasilag*, 2012 WL 6568409, at *3 (denying motion to dismiss where adviser and subadvisers provided "substantially the same services" and rejecting argument that adviser's fee was justified because it provided "administrative and supervisory services") (citing *Curran*,

2010 WL 2889752, at *9); *In re Federated,* 2009 WL 5821045, at *7 (comparing defendants'
subadviser arrangements in the open market and concluding that "Defendants thus are able to
provide a comparable service on the open market for a fraction of the cost charged to the
Kaufmann Fund.").  In any event, the arguments raised by Defendant here regarding purported
differences in the services provided is a "merits argument . . . more appropriate at summary
judgment." *Kasilag,* 2012 WL 6568409, at *3 (citing *Curran,* 2010 WL 2889752, at *9).

Defendant submits an alternative fee comparison that it contends supports a competing
inference that the advisory fees charged to the JPMIM Funds are within the range that could be
negotiated at arm's-length and appropriate under § 36(b).  *See* Def. Br. at 11.  However, just like
the court found in *Reso,* such comparison is of "little value."  *Reso,* 2011 WL 5826034, at *8.

Defendant compares the fees charged by JPMIM to the JPM Funds with the fees charged
by the ***adviser-sponsors*** to the Subadvised Funds (*see* Def. Br. at 11).  That is exactly the
comparison of fees charged by advisers to their captive mutual funds that the Supreme Court
cautioned against in *Jones* because such advisor-sponsor fees may not be the product of
negotiations conducted at arm's-length.  *Jones,* 559 U.S. at 350-51.

Even Defendant's authority recognizes that comparisons to the fees charged by other
adviser-sponsors to their captive mutual funds are "not particularly meaningful precisely because
[they] do[] not address ***the particular services offered by the defendants in this case***."  *Migdal,*
248 F.3d at 327 (emphasis added).  Further, courts have held that fee arrangements like those
between the Subadvised Funds and their adviser-sponsors may themselves violate § 36(b).  *See,
e.g.*, *Kasilag,* 2012 WL 6568409, at *3; *Curran,* 2010 WL 2889752, at *9.

As summarized in the table below, the record before the Court on this Motion does not
include any facts that the advisory fees charged by the adviser-sponsors to the Subadvised Funds

were negotiated at arm's-length, that any services provided by the adviser-sponsors to the Subadvised Funds are comparable to the services provided by JPMIM to the Funds, or that those fees are not excessive themselves.

| | *Fee Challenged*: Advisory Fees Charged to JPM Funds | *Plaintiffs' Comparison*: Subadvisory Fees Charged to Subadvised Funds | *Defendants' Comparison*: Advisory Fees Charged to Subadvised Funds |
|---|---|---|---|
| **Paid to:** | JPMIM (¶ 49) | JPMIM (¶ 63) | Adviser-sponsors of Subadvised Funds (¶ 62) |
| **Determined by:** | JPMIM, subject to approval by Board (¶¶ 102-114) | Arm's-length negotiations between JPMIM and adviser-sponsors of Subadvised Funds (¶¶ 115-119) | No facts in record. |
| **Services covered:** | Investment advisory services covered by IAAs between JPMIM and Funds (¶¶ 29-48) | Investment advisory services covered by Subadvisory Agreements between JPMIM and adviser-sponsors of Subadvised Funds (¶¶ 65-78) | No facts in record. |

Even if relevant, Defendant's comparisons to the fees paid by the Subadvised Funds to their adviser-sponsors raise merits issues that can be resolved at summary judgment or trial.

**C. Plaintiffs' § 36(b) Claims Are Not Based Merely Upon a Lack of "Fee Parity."**

Defendant argues that the 1940 Act does not ensure "fee parity" or the "best deal" (Def. Br. at 11-14),[6] and in doing so simply ignores Plaintiffs' actual allegations. Plaintiffs do not "simply allege that one fee is higher than another" in order to demonstrate the excessiveness of Defendant's advisory fees. *See* Def. Br. at 2. Neither do Plaintiffs allege that Defendant must charge the same fees to all of its clients. Rather, consistent with *Jones*, Plaintiffs allege facts

---

[6]    In reaching the conclusion that the 1940 Act does not require "fee parity," the Supreme Court in *Jones* was responding to the petitioners' contention "that a fiduciary may charge its clients no more than its independent clients." 559 U.S. at 350 (internal quotation marks and citation omitted).

demonstrating that the JPM Funds pay advisory fees to Defendant that are substantially higher than the fees negotiated at arm's length by the Subadvised Funds for Defendant's advisory services, and that the difference in fees cannot be explained by any difference in the services provided.  Such allegations cannot be characterized as a fee "parity" claim.

Defendant's argument that the allegations regarding the fees paid by the Subadvised Funds are not enough to state a claim, notwithstanding Plaintiffs' showing that the services provided by Defendant are the same or substantially the same, cannot be squared with:  the *Jones* Court's express holding that such comparisons should be given "the weight that they merit in light of the similarities and differences between the services that the clients in question require," *Jones*, 559 U.S. at 350; *Jones'* repeated instruction that courts should "use the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees," *id*. at 347;[7] or the numerous cases, both before and after *Jones*, holding that such comparisons are probative of a claim under § 36(b) discussed herein.

The two § 36(b) cases cited by Defendant are not to the contrary.  In *Migdal*, the plaintiffs relied upon, *inter alia*, allegations that two or three "allegedly similar" mutual funds charged lower fees, but those other funds were managed by other investment advisers (not the defendant), and plaintiffs did not allege any facts establishing that the services provided to the other funds by their investment advisers were comparable to the services provided by the defendant to the fund on whose behalf plaintiffs asserted claims.  The Court rejected these allegations as "not particularly meaningful precisely because [they] do[] not address ***the particular services offered by the defendants in this case***."  *Migdal*, 248 F.3d at 327 (emphasis added).  Here, in contrast, Plaintiffs rely on a comparison to the fees charged ***by Defendant*** to

---

[7]  *See also Jones*, 559 U.S. at 355 ("'*The essence of the test is whether or not under all the circumstances the transacation carries the earmarks of an arm's length bargain.*'") (quoting *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)) (emphasis in original).

independent mutual fund clients for the ***same or substantially the same*** services it provides to the JPM Funds.

Defendant's reliance on *Krinsk v. Fund Asset Mgmt. Inc.*, 875 F.2d 404 (2d Cir. 1989) is equally unavailing. As an initial matter, the plaintiffs' claims in *Krinsk* were dismissed only ***after trial***. Morever, although plaintiffs in *Krinsk* relied on a comparison to another mutual fund managed by the defendant, that other fund and its shareholders received different services from the defendant. *Id.* at 412. Here, in contrast, Plaintiffs have alleged that Defendant provides the same or substantially the same services to the JPM Funds and the Subadvised Funds. Thus, the *Krinsk* court's holding, after trial, that the other mutual fund was not a proper comparison point for the fund at issue there because of differences in the provided services offers nothing as to whether the Complaint's allegations about the fees paid and services rendered by Defendant to the Funds and Subadvised Funds are sufficient to survive a motion to dismiss.

Bereft of any authority in their favor addressing § 36(b) claims founded upon allegations parallel to those here, Defendant resorts to inapposite analogies to ERISA cases—citing to this Court's decision in *In re Honda of Am. Mfg., Inc. ERISA Fees Litig.*, 661 F. Supp. 2d 861 (S.D. Ohio 2009). Plaintiffs in that case asserted two causes of action under ERISA based upon allegations that "Defendants' misconduct impaired the value of the Plan assets held in their individual accounts." *Id.* at 865. The Court dismissed both counts after finding that there is "nothing in ERISA" that prohibited the defendant's actions in selecting investment offerings for a retirement plan. *Id.* at 866-67. The facts and holding in that case have no applicability to allegations regarding excessive fees under § 36(b) of the 1940 Act.

## VI. DEFENDANT REALIZED ECONOMIES OF SCALE AND DID NOT APPROPRIATELY SHARE THE BENEFITS WITH THE JPM FUNDS

"Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services. Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale." *Migdal*, 248 F.3d at 326-27. The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

David Swensen, *Unconventional Success*: *A Fundamental Approach to Personal Investment* (2005), p.238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id*.

Plaintiffs' allegations demonstrate that, when coupled with the historical growth in AUM, Defendant's failure to institute breakpoints in the Funds' fee schedules has allowed Defendant to reap a windfall in the form of increased profits that are not justified by any change in the nature or quality of the services provided to the Funds. ¶¶ 88-101.

### A. The Complaint Adequately Alleges that JPMIM Realized Economies of Scale and Failed to Appropriately Share the Benefits with the Funds.

The factual allegations in the Complaint are more than sufficient to draw the plausible inference that Defendant benefitted from economies of scale and profited in managing the Funds while not appropriately sharing those benefits with the Funds.

Plaintiffs have plausibly alleged that (i) each Fund's AUM grew and remained substantially above historic assets levels, resulting in significant increases in the advisory fees charged to the Funds by Defendant; (ii) the increase in the Funds' AUM and advisory fees was not accompanied by a proportionate increase in the nature and quality of the services provided by Defendant or the effort required to perform those services; and (iii) the Funds' fee rates were not reduced through breakpoints or otherwise to reflect the economies of scale realized by Defendant.  ¶¶ 88-101.

Plaintiffs' allegations here are of the same nature and specificity that the court found sufficient in *Kasilag*.  As Plaintiffs do here, the plaintiffs in *Kasilag* alleged that the defendant's costs did not increase proportionately as the funds' AUM increased, resulting in the benefits of economies of scale accruing to the defendant.  2012 WL 6568409, at *6; *compare with* ¶ 94. While the funds at issue in *Kasilag* had breakpoints, the plaintiffs there alleged that that the captive fund's "fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of economies of scale."  2012 WL 6568409, at *6.   Here, there are *no* breakpoints in the Funds' investment advisory fee schedules such that the investment advisory fee rate paid by each Fund remains the same regardless of the amount of growth in the Funds' AUM (*see* ¶ 100), rendering them even more egregious than the fee schedules in *Kasilag*.  *See* U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT MANAGEMENT, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT COMPANY REGULATION 256 n.12 (May 1992) ("An advisory fee that does not scale down as company assets increase consequently may yield enormous profits to the adviser, to the detriment of shareholders.").[8]

---

[8]    Available at http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf.

As in *Kasilag,* Plaintiffs also include comparisons between the JPM Funds' advisory fee schedules and the Subadvisory Funds' fee schedules negotiated at arm's length. *Compare Kasilag,* 2012 WL 6568409, at *6 *with* ¶¶ 80, 82, 84, 97. The subadvisory fee schedules here either contain breakpoints, which enable the Subadvised Funds to benefit from economies of scale as AUM increase, and/or have a lower fee rate which incorporates the benefits of economies of scale throughout the fee schedule. ¶¶ 80-85. Based on similar allegations, the court in *Kasilag* held: "In light of these well-pleaded facts, Plaintiffs have sufficiently alleged that [the adviser-defendant's] breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds . . . . Accordingly, this *Gartenberg* factor weighs in Plaintiffs' favor." 2012 WL 6568409, at *6.

Similarly, in *In re Federated*, the plaintiffs alleged that the fund's fee schedule, which contained no breakpoints (like here), caused the advisory fees charged to the funds to double in the previous four years as the assets of the fund grew. 2009 WL 5821045, at *7. This, plaintiffs argued, allowed the defendants to reap the benefit of economies of scale rather than passing them on to the plaintiffs' fund. *Id.* at *6. The court agreed, finding that "defendants have completely failed to pass along any economies of scale gained by the fund's growth over recent years . . . and instead have consumed these saving for their own benefit . . . a practice which section 36(b) was aimed at curtailing." *Id.* at *8. Here, the aggregate amount of investment advisory fees paid by the JPM Funds has increased by more than 753% between 2008 and 2013. ¶ 8.

None of the authority cited by Defendant supports its position that the allegations regarding economies of scale pled here are insufficient. To the contrary, one case recognizes that allegations similar to those made here are sufficient to plead economies of scale. *See In re Goldman Sachs,* 2006 WL 126772, at *9 n.24 (acknowledging that, unlike the case before it, the

26

plaintiffs in *Wicks* sufficiently pled economies of scale by alleging that "though fees had increased significantly over time, the quality of services rendered had not substantially changed"); *compare with* ¶ 94.

Defendant's reliance on *Krinsk* provides no support for dismissal of § 36(b) claims at the pleading stage.  As previously discussed, plaintiffs' claims in *Krinsk* were dismissed only after trial.  Moreover, *Krinsk* involved money market funds, which require different services and involve different costs than mutual funds such as those at issue here.  *See Krinsk*, 875 F.2d at 406-07.  Here, the investment advisory fees charged to the Funds cover investment advisory services, and the Funds pay separate fees for shareholder services. *See, e.g.*, ¶ 87.  Accordingly, the failure by plaintiffs in *Krinsk* to prove at trial economies of scale with respect to shareholder services in connection with money market funds is inconsequential.

None of the other cases cited by Defendant involves factual allegations similar to those here regarding (i) a complete lack of any breakpoints in the funds' advisory fee schedule, (ii) the extent of sharing economies of scale reflected in the fee schedules for comparable services negotiated at arm's length, or (iii) no change in services rendered.

The allegations in the cases Defendant cites also were deficient for reasons not present here.  *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 344 (2d Cir. 2006) (plaintiffs "'failed to allege any facts pertinent to th[e] relationship between fees and services'" (alteration in original) (citation omitted)); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *4 (S.D.N.Y. Mar. 20, 2009) ("the absence of facts sufficient to provide context for any *Gartenberg* factor that would support Plaintiffs' claims of excessive fees…." ); *In re Scudder Mut. Funds Fee Litig.,* No. 04 Civ. 1921, 2007 WL 2325862, at *17 (S.D.N.Y. Aug. 14, 2007) (failed to allege that fees were excessive, or disproportionate to the services rendered, and

alleged economies of scale related to funds in which no named plaintiffs had invested or to time periods far outside the statute of limitations and plaintiff merely alleged that fees increased with the size of the fund); *In re Goldman Sachs*, 2006 WL 126772, at *9 ("[P]laintiffs rely on allegations regarding *Rule 12b-1* fees, which are inappropriate to establish that the *advisory* fees were excessive."); *In re Evergreen Mut. Funds Fee Litig.*, 240 F.R.D. 115, 122 (S.D.N.Y. 2007) ("Plaintiffs have not alleged sufficient facts to support even one of the *Gartenberg* factors."); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2006 WL 1520222, at *2-3 (S.D.N.Y. May 31, 2006) (denying leave to amend on futility grounds where plaintiffs relied on evidence that "independently endorse[d] the fee levels at issue" and on statistics that "undercut[]" plaintiffs' renewed allegations); *Turner v. Davis Select Advisers LP*, No. 08-CV-421, slip op. at 14-15 (D. Ariz. June 1, 2001) ("Plaintiff challenges the *use* of the fee…and does not allege that the fee level exceeded what was reasonable for the service provided" and relied on comparisons with "other funds that are not comparable to this Fund.").[9]

Ultimately, to **prove** the economies of scale realized by the Defendant will require certain financial information, such as Defendant's internal costs, which must be obtained in discovery. Indeed, data regarding investment adviser's operations are not readily available even to the SEC, much less to fund shareholders. *See* U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT MANAGEMENT: REPORT ON MUTUAL FUND FEES AND EXPENSES (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm ("2000 SEC Report") (concluding that "we cannot analyze directly the cost of providing portfolio management services to a mutual

---

[9]    Defendant also relies on *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332 (S.D.N.Y. 2007).  But, in that case, the plaintiffs failed to allege anything about the services offered to the fund in relation to the fees charged. *Id.* at 338.  In any event, the Second Circuit reinstated certain § 36(b) claims, notwithstanding any purported deficiencies in the allegations about economies of scale. *See R.W. Grand Lodge*, 425 Fed. Appx. at 31.

fund in order to determine whether economies exist (because the data are unavailable)"); *see also Curran*, 2010 WL 2889752, at *9 (finding that the question of whether shareholders actually benefitted from economies of scale would require a "factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion, where the Court must take Plaintiffs' factual allegations as true and make all reasonable inferences in favor of Plaintiffs"). Likewise, under *Twombly* and *Iqbal*, at the pleading stage, "[a]ll that is necessary is that a plaintiff set forth enough factual matter to show the claimed entitlement to relief is plausible on its face and there is a reasonable expectation that discovery will produce evidence to support the claim." *In re Federated,* 2009 WL 5821045, at *3.

### B. The Decrease in Assets in Fiscal Year 2014 Does Not Undermine Plaintiffs' Economies of Scale Allegations

Because the assets of the Funds have increased dramatically between 2008 and 2013, *see* ¶89, JPMIM has continued to realize economies of scale despite the slight decrease in AUM for the most recent fiscal year.

The mere fact that AUM of the Funds slightly decreased during 2014, does not change the fact that Defendant is still charging the Funds advisory fees that are between 650% and 1,643% higher than the fees charged to the Funds in 2008, despite no proportionate changes in the work or cost required by Defendant to provide advisory services to the Fund. ¶¶ 88-94. Because the Funds' fee schedules do not include breakpoints and have not otherwise been reduced to reflect the economies of scale resulting from the substantial increase in AUM, Defendant continues to capture the benefits of economies of scale for itself in the form of higher fees and profits, without appropriately sharing the benefits with the Funds.

The graph below illustrates the concept behind economies of scale based on the allegations in the Complaint with respect to the JP Morgan Core Bond Fund.  *See* ¶ 89.



In analyzing economies of scale allegations, courts have looked to the growth beyond the one-year period preceding the filing of the complaint.  *See, e.g., Reso*, 2011 WL 5826034, at *2 (denying motion to dismiss where plaintiffs alleged, *inter alia*, "that the funds in this case have grown over time, allowing [defendant] to take the same percentage from a higher pool of funds with little additional work"); *In re Federated,* 2009 WL 5821045, at *7 (denying motion to dismiss and comparing assets and fees between 2003 and 2007);  *Sins*, 2006 WL 3746130, at *3 (denying motion to dismiss and comparing assets and fees between 1993 and 2002); *Strigliabotti*, 2005 WL 645529, *3–4 (denying motion to dismiss where plaintiffs alleged, *inter alia*, that "defendants have retained excess profits resulting from economies of scale" as a result of the funds dramatic growth over a 20 year period, "while the nature of the services rendered has not changed").

Thus, the Complaint raises a plausible inference that Defendant benefitted from economies of scale while not appropriately sharing those benefits with the JPM Funds.

## VII. APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE

The Court in *Jones* held that "a measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on the circumstances." *Jones*, 559 U.S. at 349.

> [W]here the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. When an investment adviser fails to disclose material information to the board, greater scrutiny is justified because the withheld information might have hampered the board's ability to function as an independent check upon the management.

*Id.* at 351-52 (internal quotations and citations omitted).

Consistent with Congress's intent "not to rely solely on the fund's directors to assure reasonable adviser fees" and to establish § 36(b) as an "independent check[] on excessive fees," *Daily Income Fund*, 464 U.S. at 540-41, the Court in *Jones* emphasized that even a "robust" process will not by itself insulate the adviser from liability for excessive fees. *See Jones*, 559 U.S. at 351 ("This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" (citation omitted)).

Plaintiffs adequately allege that the board approval process for the Funds was "deficient," rather than "robust," and, therefore, the Funds' fees should be subject to "greater scrutiny" under *Jones*. The approval process was neither competitive nor conducted at arm's length, in contrast to the process by which the adviser-sponsors of the Subadvised Funds select investment advisers for those funds. ¶¶ 104-119. For example, whereas the adviser-sponsors of the Subadvised Funds solicited proposals from multiple candidates and negotiated with the candidates regarding the fees to be charged (¶¶ 115-119), the Board has not solicited proposals from other investment

31

advisers to provide investment advisory services to the Funds (¶ 111).  Further, the Board has not negotiated a "most favored nation" provision into the IAA, which would enable the Funds to benefit from fees negotiated at arm's length even if the Board did not engage in such negotiations with JPMIM.  ¶ 112.

Moreover, the Board, *inter alia*:  (i) relied on information and analyses that JPMIM prepared or were designed to support JPMIM's rationalization for the fees charged to the Funds; (ii) did not consider information or analyses reflecting the interests of the Funds when assessing the investment advisory fees or JPMIM's rationalization for those fees; (iii) approved the IAA charging the Funds investment advisory fees as much as 525% higher than other mutual fund clients pay for the same or substantially the same services; (iv) accepted JPMIM's representations that the lower fees paid by other clients reflect differences in the services provided to those clients without appropriately examining whether the services actually are different and without considering information necessary to assess whether the difference in fees is warranted by any purported differences in the services provided; (v) approved advisory fee arrangements (which include no breakpoints) that enable JPMIM to retain for itself the vast majority of the benefits of economies of scale without appropriately sharing those benefits with the Funds; and (vi) did not devote adequate time to their consideration of the Funds' advisory contracts.  ¶¶ 5, 100, 107-114.

Courts have found similar allegations sufficient to withstand a motion to dismiss.  For example, in *Reso*, the plaintiff alleged that defendants "fail[ed] to provide the directors with 'sufficient, complete, and/or accurate information' or meaningful information about economies of scale, while also providing 'misleading information to the directors.'"  2011 WL 5826034, at *6.  Recognizing the evidentiary difficulties associated with pleading facts regarding a board of

directors' approval process, the court deemed those allegations "to be specific enough to raise an inference of lack of independence." *Id*. The court further added that it "cannot expect [plaintiff] to know or outline the exact contours of the directors' decision making processes." *Id*.

The court in *Kasilag* likewise found allegations similar to those here sufficient. Among other things, the board in *Kasilag* was alleged to have been responsible for overseeing 85 mutual funds, precluding them from assessing each fund individually, and approving contracts that provided exorbitant fees in relation to the services provided. *Kasilag*, 2012 WL 6568409, at *7. The court held that "the directors' approval requires somewhat less deference than it would have had they diligently performed their 'watchdog' role." *Id.*; *see also Hunt*, 2006 WL 1581846, at *4 (denying motion to dismiss and holding that "a failure of the trustees to receive full information and act conscientiously may be indicative of a breach of fiduciary duty under section 36(b)"); *Dumond*, 2006 WL 149038, at *3 (denying motion to dismiss where plaintiffs alleged that "defendants provided the trustess [sic] with virtually no information regarding the advisory fees being charged to non-MFS Fund clients and the economies of scale or fall-out benefits received by the defendants, the trustees failed to request and evaluate information reasonably necessary to make an informed decision regarding the MFS Funds' distribution plans, and the trustees rarely, if ever, questioned any information or recommendations provided by the defendants").

Defendant's citations are easily distinguished. Unlike *Migdal*, *Gallus* and *Amron*, Plaintiffs here are not arguing that, by itself, either a deficient board approval process or the Board's reliance on information provided by the JPMIM pleads a violation of § 36(b). *See Migdal*, 248 F.3d at 328 ("[P]laintiffs assert that they do not need to allege excessive fees because they instead alleged that the directors of the funds were not independent."); *Gallus v.*

*Ameriprise Fin., Inc.*, 675 F.3d 1173, 1180 n.4 (8th Cir. 2012) ("We disagree with the plaintiffs' argument that '[a] defective process implies an excessive fee.'" (alteration in original)).[10]   For the same reason, Defendant's reliance on *Amron*, 464 F.3d at 344-45, for the mundane proposition that service on multiple boards of other mutual funds is insufficient as a matter of law to challenge trustee independence (Def. Br. at 17), misses the mark.[11]

Plaintiffs do not rely on one allegation to establish a deficient approval process.  Rather, Plaintiffs have set forth numerous facts and circumstances, which when read as a whole, plausibly support their § 36(b) claim, including allegations that the Board's approval process was deficient and, therefore, should be afforded little deference requiring the court to "take a more rigorous look at the outcome."  *Jones*, 559 U.S. at 351.

In any event, even if the board approval process had been "robust," Plaintiffs state a claim under § 36(b) based on allegations that Defendant charges significantly higher fees to the Funds than are charged to the Subadvised Funds for the same or substantially the same services and have failed to appropriately share the benefits of economies of scale with the Funds.  *See Jones*, 559 U.S. at 351 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information . . . .").

---

[10]     *Gallus* was also decided at summary judgment and the court held that "[a]lthough the disparity in fees charged to [defendant's] different [institutional] clients is likely relevant to whether the fees fall within the arm's length range…the plaintiffs have failed to set forth the additional evidence required to survive summary judgment."  675 F.3d at 1180-81 (citation omitted).

[11]     Further, in contrast to Plaintiffs Complaint here, the complaint in *Amron* failed to allege any facts supporting an inference that the challenged fees were disproportionate to the services provided and, therefore, failed to state a claim under § 36(b) irrespective of the allegations regarding the board approval process.  464 F.3d at 344.

## VIII.    RESCISSION IS AVAILABLE PURSUANT TO SECTION 47(b)

Finally, Plaintiffs do not assert a separate cause of action under § 47(b) of the 1940 Act. *See* Def. Br. at 18-19.  Rather, Plaintiffs seek rescission as a remedy for Defendant's § 36(b) violation.

While Plaintiffs are not parties to the underlying agreements, Plaintiffs are asserting claims "***on behalf of***" the Funds, which are parties to the agreements.  15 U.S.C. § 80a-35(b). Thus, once the § 36(b) claims are sustained, § 47(b) provides recessionary relief to the Funds.  In the cases cited by Defendant, § 36(b) claims were either not pled or were dismissed.  *See Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, No. A-06-CA-540, 2007 WL 6926718 (W.D. Tex. Jan. 23, 2007) (no § 36(b) claim pled); *Davis v. Bailey*, No. CIVA 05CV00042, 2005 WL 3527286, at *6-7 (D. Colo. Dec. 22, 2005) (dismissing § 36(b) claim and addressing standing issue in *dicta*).

### CONCLUSION

Judged under the standard set forth in *Jones*, Plaintiffs' Complaint, taken as a whole, states a plausible claim for relief under § 36(b).  For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

**MEYER WILSON CO., LPA**

/s/ Matthew R. Wilson
David P. Meyer (Ohio Bar #0065205)
Matthew R. Wilson (Ohio Bar # 0072925)
Michael J. Boyle, Jr. (Ohio Bar #0091162)
1320 Dublin Road, Suite 100
Columbus, OH 43215
Tel: (614) 224-6000
Fax: (614) 224-6066

35

**ZWERLING, SCHACHTER &
ZWERLING, LLP**
Robin F. Zwerling (admitted *pro hac vice*)
Jeffrey C. Zwerling (admitted *pro hac vice*)
Susan Salvetti (admitted *pro hac vice*)
Andrew W. Robertson (admitted *pro hac vice*)
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Bradley Thomas Ferrell | ferrell@litohio.com |
| Stephen Walter Tigges | tigges@litohio.com |
| John Walcott Zeiger | zeiger@litohio.com |
| David I. Freeberg | dfreeburg@goodwinprocter.com |
| Mark Holland | mholland@goodwinprocter.com |
| Michael K. Isenman | misenman@goodwinprocter.com |

*/s/ Matthew R. Wilson*
Matthew R. Wilson

*Attorney for Plaintiffs*