# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

NANCY GOODMAN, *et al.*,

        Plaintiffs,

    v.

J.P. MORGAN INVESTMENT
MANAGEMENT, INC., *et al.*,

        Defendants.

        **Case No. 2:14-cv-414**
        **CHIEF JUDGE EDMUND A. SARGUS, JR.**
        **Magistrate Judge Kimberly A. Jolson**

CAMPBELL FAMILY TRUST, *et al.*,

        Plaintiffs,

    v.

J.P. MORGAN INVESTMENT
MANAGEMENT, INC., *et al.*,

        Defendants.

        **Case No. 2:15-cv-2923**
        **CHIEF JUDGE EDMUND A. SARGUS, JR.**
        **Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Defendants'[1] Motion for Summary Judgment (*Def.*

*Mot. S.J.*, ECF No. 113; ECF No. 82) in this consolidated action.[2] In turn, Plaintiffs have filed a

Memorandum of Law in Opposition (*Pl. Mem. Opp.*, ECF No. 118), and Defendants have filed a

---

[1] Pursuant to Fed. R. Civ. P. 56(a), Defendant J.P. Morgan Investment Management Inc. moves for summary judgment on its own behalf and as successor-in-interest to Defendant JP Morgan Funds Management, Inc. (*Def. Mot. S.J.*, ECF No. 113 at p. 1.)

[2] For ease of reference, wherever possible the Court will refer to the consolidated filings using the ECF number for the document filed on the docket in the first filed case, *Goodman*, 2:14-cv-414. Defendants' Motion for Summary Judgment is filed at 2:14-cv-414, ECF No. 113, and at 2:15-cv-2923, ECF No. 82.

Reply Memorandum (*Def. Reply*, ECF No. 122). Plaintiffs also filed a Motion for Leave to File a Sur-Reply in Opposition to Defendants' Motion for Summary Judgment (ECF No. 124), to which Defendants have filed a Response in Opposition (ECF No. 127). These motions are ripe for decision.

Additionally, Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment on Count II of the *Goodman* Complaint for Lack of Subject Matter Jurisdiction (*Def. Mot. Dismiss Count II*, ECF No. 110). Thereafter, Plaintiffs filed a Memorandum of Law in Opposition (*Pl. Opp. Mot. Dismiss Count II*, ECF No. 116), and Defendants filed a Reply Memorandum (*Def. Reply Mot. to Dismiss Count II*, ECF No. 120). Additionally, Plaintiffs filed a Motion for Partial Summary Judgment (*Pl. Mot. Partial S.J.*, ECF No. 111), and Defendants filed a Memorandum in Opposition (*Def. Mem. Opp. Partial S.J.*, ECF No. 117). Plaintiffs then filed a Reply Memorandum of Law (*Pl. Reply Partial S.J.*, ECF No. 121), and these too are fully at issue.

Finally, Plaintiffs filed an Unopposed Motion to File Redacted Financial Documents and Partially Seal Filings (ECF No. 125); Defendants Filed a Motion to Seal (ECF No. 126); two nonparties filed Motions to Join Defendants' Motion to Seal (ECF Nos. 130, 131); and Plaintiffs filed a Motion for Leave to File a Response to Defendants' Notice of Supplemental Authority (ECF No. 133). Those motions too are ripe for review.

## I. INTRODUCTION

Plaintiffs in this consolidated action are five shareholders of seven mutual funds (the "Funds") managed by Defendants J.P. Morgan Investment Management Inc. ("JPMIM") and J.P. Morgan Funds Management, Inc. ("JPMFM") (collectively, "Defendants"). The Funds are registered investment companies under the Investment Company Act of 1940 ("ICA"), 15 U.S.C.

§ 80a-1, *et seq.* Plaintiffs brought suit under Section 36(b) of the ICA against Defendants for allegedly charging excessive advisory and/or administrative fees in violation of their fiduciary duty under the ICA. Section 36(b) of the ICA gives private litigants a one-year limitations period in which to bring suit. 15 U.S.C. § 80a-35(b). Damages are limited to fees received by investment advisers within the prior year. 15 U.S.C. § 80a-35(b)(3). Because Section 36(b) is "equitable" in nature, Plaintiffs are not entitled to a jury trial.[3]

## A. The Parties

### *1. The Goodman Plaintiffs*

Plaintiffs Nancy Goodman and Jacqueline Peiffer (together, "*Goodman* Plaintiffs") bring this action against Defendants on behalf of and for the benefit of three bond funds: the JPMorgan Core Bond Fund (the "Core Bond Fund"), and the JPMorgan High Yield Fund (the "High Yield Fund"), and the JP Morgan Short Duration Bond Fund (collectively, the "Bond Funds" or the "Funds") pursuant to Section 36(b) of the ICA. (*Am. Compl.*, Case No. 2:14-cv-414, ECF No. 64.)

Plaintiffs assert two types of claims against Defendants on behalf of each of the funds—a claim that Defendant JPMIM charged excessive advisory fees to each of the funds (Counts I, II, and III), and a claim that Defendant JPMFM charged excessive administrative fees to each of the funds (Counts IV, V, and VI).

Plaintiffs move to dismiss the claim on behalf of the JPMorgan Short Duration Bond Fund against JPMIM with regard to advisory fees (Count III), which is unopposed and hereby granted. (ECF No. 106.) Plaintiffs maintain their remaining claims on behalf of the JPMorgan Core Bond Fund and the JPMorgan High Yield Fund against JPMIM with regard to advisory

---

[3] Plaintiffs have withdrawn their jury demand. (*Goodman*, ECF No. 95; *Campbell*, ECF No. 64.)

fees (Counts I and II), and maintain all of their claims on behalf of all three funds against JPMFM with regard to administrative fees (Counts IV, V, and VI).

### 2. *The Campbell Plaintiffs*[4]

Plaintiffs Anne H. Bradley, Casey Leblanc, Jack Hornstein, Joseph Lipovich, Jacqueline Peiffer, Campbell Family Trust and Valderrama Family Trust (together, "*Campbell* Plaintiffs") bring this action against Defendants on behalf of and for the benefit of these four equity funds: (1) the JPMorgan Mid Cap Value Fund ("Mid Cap Value Fund"),[5] (2) the JPMorgan Large Cap Growth Fund ("Large Cap Growth Fund"), (3) the JPMorgan Value Advantage Fund ("Value Advantage Fund"), and (4) the JPMorgan US Equity Fund ("US Equity Fund") (collectively, the "Equity Funds" or the "Funds"), pursuant to Section 36(b) of the ICA. (*Compl.*, Case No. 2:15-cv-2923, ECF No. 1.)

Plaintiffs assert two types of claims against the Defendants on behalf of each of the funds—a claim that Defendant JPMIM charged excessive advisory fees to each of the funds (Counts I, II, and III), and a claim that JPMFM charged excessive administrative fees to each of the funds (Counts IV, V, VI, and VIII).

---

[4] Plaintiff Joseph Lipovich was dismissed from the case on Plaintiffs' Unopposed Motion to Dismiss Certain Claims and Parties (ECF No. 106). (*Order*, December 13, 2016, *Goodman*, ECF No. 93, *Campbell*, ECF No. 62.) On March 28, 2017, the *Campbell* Plaintiffs filed a Statement Noting the Death of Plaintiff Jack Hornstein. (ECF No. 101.)

[5] Plaintiff Jacqueline Peiffer's claims against the Mid Cap Value Fund were dismissed on Plaintiffs' Unopposed Motion to Dismiss Certain Claims and Parties (ECF No. 106). (*Order*, December 13, 2016, *Goodman*, ECF No. 93, *Campbell*, ECF No. 62.)

### 3. *The Defendants*

The Defendants are JPMIM (or "Advisor") and JPMFM (or "Administrator"), Adviser and Administrator for the Funds. [6] JPMIM is a wholly-owned subsidiary of JPMorgan Asset Management, Holdings Inc., which itself is a wholly-owned subsidiary of J.P. Morgan Chase & Co ("the Bank" or "JPMorgan").

The Funds are overseen by a Board of Trustees (the "Board"), which is responsible for, among other things, selecting and monitoring the Fund's service providers. The Board selected Defendants to serve as service providers for the Funds. Defendant JPMIM is the investment adviser to the Funds and receives an annual fee from each Fund for providing investment advisory services, including managing each Fund's portfolio of securities, researching potential investments and deciding which securities will be purchased for or sold from the portfolio of assets. Defendant JPMFM is the administrator to the Funds (and an affiliate of JPMIM) and receives an annual fee from each Fund for providing administration services, including supplying the Funds with officers approved by the Board of Directors, drafting amendments to the Funds' governing documents, negotiating contracts with and evaluating the Funds' other service providers, and overseeing other services for the Funds.

### 4. *The Funds*

Each of the funds is an "open-end" management investment company, also known as a "mutual fund," registered under the ICA. The Funds do not have employees or facilities of their own. The Funds' operations are conducted by external service providers, such as Defendants, pursuant to contracts. In exchange for the investment advisory services provided by the Adviser to the Funds, the contracts, known as Investment Advisor Agreements ("IAAs"), require each of

---

[6] The Court dismissed Plaintiffs' claims against sub-administrator J.P. Morgan Chase Bank, N.A. *See Opinion and Order*, *Goodman*, ECF No. 75, *Campbell*, ECF No. 48.

the Funds to pay the Adviser an annual fee that is calculated as a percentage of each of the Fund's assets under management or "AUM." The fees were approved by the Board, and were disclosed in each Fund's prospectus and other SEC filings. Collectively, the Funds had $105 billion in AUM at the close of their respective Fiscal Years 2015.

### B. The Claims

The counts against the Adviser and the Administrator in this consolidated case are as follows:

| Fund | Fund Type | Claims Against the Adviser | Claims Against the Administrator |
|---|---|---|---|
| Core Bond Fund | Bond | *Goodman* Count I | *Goodman* Count IV |
| High Yield Fund | Bond | *Goodman* Count II | *Goodman* Count V |
| Short Duration Bond Fund | Bond | None | *Goodman* Count VI |
| Mid Cap Value Fund | Equity | *Campbell* Count I | *Campbell* Count IV |
| Large Cap Growth Fund | Equity | *Campbell* Count II | *Campbell* Count V |
| Value Advantage Fund | Equity | *Campbell* Count III | *Campbell* Count VI |
| Strategic Income Opportunities Fund | Bond | None | None[7] |
| U.S. Equity Fund | Equity | None | *Campbell* Count VIII |

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. As the Supreme Court has explained, "the plain language of Rule 56[] mandates entry of summary judgment, after adequate time for discovery

---

[7] *Campbell* Count VII was dismissed on Plaintiffs' Unopposed Motion to Dismiss Certain Claims and Parties. (*Order*, December 13, 2016, *Goodman*, ECF No. 93, *Campbell*, ECF No. 62.)

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). The central issue for the Court to determine is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Fiduciary Duty under Section 36(b) of the Investment Company Act

Plaintiffs allege that Defendants breached their fiduciary duty to the Funds under Section 36(b) of the ICA, as amended. Section 36(b) of the statute provides that:

> (b) For the purposes of this subsection, the investment advisor of a registered investment company shall be deemed to have a fiduciary duty with respect to compensation for services . . . . An action may be brought under this section by the [Securities and Exchange] Commission, or by a security holder of such registered investment company on behalf of such company . . . .

7

(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

(2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.

15 U.S.C. § 80a-35(b)(2).

The statute provides that the burden of proving a breach of fiduciary duty is on plaintiffs. In *Jones v. Harris Assocs., L.P.*, 559 U.S. 335, 348 (2010), the Supreme Court provided a road map for courts to follow in analyzing cases alleging violations of Section 36(b). The Court noted that Congress added the fiduciary standard of Section 36(b) to the ICA in 1970 "because it concluded that the shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees, notwithstanding the increased disinterestedness of the board." *Jones,* 559 U.S. at 348 (quoting *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108 (1991)). The Court further noted that the fiduciary duty standard contained in Section 36(b) "represented a delicate compromise." *Id.* at 340. The provision is "more favorable to shareholders than the previously available remedies" but "does not permit a compensation agreement to be reviewed in court for 'reasonableness.'" *Id.* at 341.

The Court adopted the meaning of fiduciary duty set forth in *Pepper v. Litton*, 308 U.S. 295 (1939). When reviewing a claim for breach of fiduciary duty, "[t]he essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Jones*, 559 U.S. at 347, quoting *Pepper*, 308 U.S. at 306-07. "[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears

no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Id.* at 346.

The Supreme Court explained that, prior to *Jones*, "the standard for an investment adviser's fiduciary duty has remained an open question in our Court, but until the Seventh Circuit's decision below, something of a consensus had developed regarding the standard set forth over 25 years ago in *Gartenberg*,"[8] and noted that the SEC's regulations have also recognized, and formalized, *Gartenberg*-like factors.[9] *Id.* at 343-44. To determine whether the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining, "all pertinent facts must be

_____

[8] *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982).

[9] The Securities and Exchange Commission ("SEC") promulgates regulations governing boards' duties to monitor the adviser's performance of its duties under the advisory contract. For example, at 17 CFR §240.14a-101, Schedule 14A, Item 22(c)(11) sets forth the information that is required to be provided in investment company proxy statements. Factors relating to the Board's selection of the investment advisor and approval of the advisory fee and any other amounts to be paid by the Fund under the contract must be discussed, as follows:

> This would include, but not be limited to, a discussion of the nature, extent, and quality of the services to be provided by the investment adviser; the investment performance of the Fund and the investment adviser; the costs of the services to be provided and profits to be realized by the investment adviser; the costs of the services to be provided and profits to be realized by the investment adviser and its affiliates from the relationship with the Fund; the extent to which economies of scale would be realized as the Fund grows; and whether fee levels reflect these economies of scale for the benefit of Fund investors. Also indicate in the discussion whether the Board relied upon comparisons of the services to be rendered and the amounts to be paid under the contract with those under other investment advisory contracts, such as contracts of the same and other investment advisers with other registered investment companies or other types of clients (*e.g.*, pension funds or other institutional investors). If the board relied upon such comparisons, describe the comparisons that were relied on and how they assisted the boards in determining to recommend that the shareholders approve the advisory contract . . . .

17 C.F.R. Part 240.14a-101, Item 22 (c)(11)(i).

weighed." *Id.*, citing *Gartenberg*, 694 F.2d at 929. These facts include the following, which are often referred to as the "*Gartenberg* factors": (1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the adviser; (3) "fall-out" benefits (*i.e.*, indirect profits to the adviser attributable in some way to the existence of the fund); (4) the economies of scale realized by the adviser; (5) comparative fee structures with similar funds; and (6) the independence and conscientiousness of the independent trustees. *Jones*, 559 U.S. at 344–45, n. 5.

"Finally, a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance." *Jones*, 559 U.S. at 351. For example, "where the board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Id.* "Thus, if the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Id.*

Furthermore, the Supreme Court stated that "[i]t is also important to note that the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 559 U.S. at 352. "Congress rejected a 'reasonableness' requirement that was criticized as charging the courts with rate-setting responsibilities." *Id.* "Congress' approach recognizes that courts are not well suited to make such precise calculations." *Id.*[10] On remand, the Seventh Circuit explained that the Supreme Court's

---

[10] Justice Thomas' concurring opinion points out that "[a]lthough virtually all subsequent § 36(b) cases cite *Gartenberg*, most courts have correctly declined its invitation to stray beyond statutory bounds. Instead, they have followed an approach (principally in deciding which cases may proceed past summary judgment) that defers to the informed conclusions of disinterested boards

approach in *Jones* "does not allow a court to assess the fairness or reasonableness of advisers' fees; the goal is to identify the outer bounds of arm's length bargaining and not engage in rate regulation." *Jones v. Harris Assocs. L.P.*, 622 Fed. App'x. 359, 360 (7th Cir. 2015) ("*Jones II* ").

## B. The "*Gartenberg* Factors"

Under *Jones*, the Court must consider a host of factors when reviewing whether fees charged were so disproportionately large that Defendants violated Section 36(b) of the ICA, including those described in *Gartenberg*, while recognizing that a court is not to assess the fairness and reasonableness of advisers' fees. Plaintiffs assert that fees are shown excessive by the lower fees Defendants charge when they serve in the role as a subadviser or subadministrator to other funds. On the other hand, Defendants assert that (1) the fact that Defendants' fees are in line with their peer group funds, and (2) the fact that they have provided a better than average ultimate rate of return to the Funds after the fees are accounted, prohibits a finding that they breached their fiduciary duty under Section 36(b). Defendants contend that under *Jones II* these "two points 'jointly suffice under the Supreme Court's standard' to warrant summary judgment in for of the defendant in a Section 36(b) case." (*Def. Mot. S.J.*, ECF No. 113, p. 14.) It is true that, in *Jones II*, the Seventh Circuit stated that in the case before it, the funds' fees were in line with those charged by comparable funds and the funds' returns (net of fees) exceeded the norm for comparable investment vehicles, and that those factors "jointly suffice under the Supreme Court's standard." *Jones II*, 611 Fed. App'x. at 360-61.

However, this Court disagrees with Defendants' interpretation of *Jones II*, *i.e.*, that undisputed evidence on these two factors alone requires summary judgment in favor of a defendant. Yet, to the extent that *Jones II* does hold as Defendants contend, it is of no moment.

---

and holds plaintiffs to their heavy burden of proof in the manner the Act, and now the Court's opinion, requires." *Jones*, 559 U.S. at 354, Thomas, J., concurring.

The Supreme Court's opinion in *Jones*, which is what governs this Court's decisions, clearly requires a trial court to review all of the relevant factors before making the determination as to whether a defendant violated Section 36(b). *Accord, N. Valley GI Med. Group v. Prudential Investments LLC*, CV JKB-15-3268, 2016 WL 4447037, at \*8 (D. Md. Aug. 23, 2016) (distinguishing *Jones II* in similar fashion based on its seeming inconsistency with Jones' requirement to review all relevant factors).

That being said, the Court notes that these two factors are telling regarding whether the fees are excessive. The Thomson Reuters Lipper ("Lipper") reports, one of the most commonly used sources to measure fees and performance in the mutual fund industry, show that overall the Funds performed better than, and the fees were in line with, other mutual funds of similar scope. (*See* Paragraph B.3, *infra*; Shlissel Decl. Ex. 4, Appendix C1 (Lipper Expense Data) and Appendix C2 (Lipper Performance Data). Plaintiffs do not and cannot deny this.

Additionally, the Funds, through fee waivers, gave back millions of dollars of fees that they were entitled to receive pursuant to their contracts. Plaintiffs do not contend that fees were not remitted; rather, they contend that even though the Funds were not required to return any of the fees, the amounts remitted were not enough. Moreover, the fees and the performance of the Funds, and the amounts of fee waivers were all part of the information considered by the Board in its review and approval of the contracts, discussed at length below. And, as mentioned at note 10 *supra*, per SEC regulation, this information is part of the factors that must be discussed by the Board as part of its process for selecting an investment advisor, and approving the advisory fee and any other amounts to be paid by the Fund under the contract. The Court examines all of this information in more detail below in its evaluation of the relevant factors indicative of whether Defendants violated Section 36(b) of the ICA.

## 1.    *Subadvised and Subadministered Funds*

Plaintiffs contend that *Jones* repeatedly instructed courts to "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." (*Pl. Mem. Opp.*, ECF No. 118, p. 2) (quoting *Jones*, 559 U.S. at 347). Plaintiffs continue, that *Jones II* explained that "the goal" of utilizing this range of fees that may have resulted from arm's-length bargaining "is to identify the outer bounds of arm's-length bargaining . . . ." *Id.* (quoting *Jones II*, 611 F. App'x at 360). Plaintiffs maintain and that the contracts for the Subadvised Funds provide "ample evidence" of those "bounds." (*Pl. Mem. Opp.*, ECF No. 118, p. 2.) Plaintiffs further assert that

> [n]o 'precise calculations' – or any calculations – are required to determine the arm's length bargaining range for JPMIM's advisory services. That range is unequivocally established by the fees that JPMIM charges to the Subadvised Funds.

(*Pl. Mem. Opp.*, ECF No. 118, pp. 17-18.)

### a.    *Claims against the Adviser - Plaintiffs' Motion for Partial Summary Judgment against JPMIM*

Plaintiffs contend that the services provided to the Funds and the services provided to the subadvised entities are "substantially" the same. Plaintiffs move for partial summary judgment against JPMIM, seeking to have the Court rule that "comparisons between the investment advisory fees that JPMIM charges the Funds and the investment advisory fees that JPMIM charges other, independent mutual funds are apt comparisons under the Supreme Court's decision" in *Jones*, "and will be given the weight they merit by the Court at trial when determining whether the investment advisory fees charged to the Funds violate § 36(b) of the Investment Company Act of 1940." (*Pl. Mot. Partial S.J.*, ECF No. 111, p.2.)

13

To the extent Plaintiffs ask this Court to compare the investment advisory fees that JPMIM charges the Funds and the investment advisory fees that JPMIM charges other, independent mutual funds, and to give them the weight they merit under such a comparison, their Motion is granted. The Court engages in such a comparison herein. The Motion is denied, however, to the extent Plaintiffs move the Court to make a finding that the comparisons reflect such similarities that the weight they merit shows that the fees JPMIM charges were so excessive that they could not have been the product of arm's-length negotiation.

The Court next reviews the comparative fee structures between the proposed comparators. In this regard, *Jones* instructs:

> If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison. Even if the services provided and fees charged to an independent fund are relevant, courts should be mindful that the Act does not necessarily ensure fee parity between mutual funds and institutional clients contrary to petitioners' contentions.

*Jones*, 559 U.S. at 350. Additionally, in a footnote the Court explained that comparisons with fees charged to institutional clients "will not 'doo[m] [a]ny [f]und to [t]rial.'" The Court explained:

> First, plaintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining. § 80a-35(b)(1). Second, a showing of relevance requires courts to assess any disparity in fees in light of the different markets for advisory services. Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services in addition to other evidence that the fee is outside the arm's-length range will trial be appropriate.

*Jones*, 559 U.S. at 355, n. 8.

In this instance, even assuming *arguendo* that some of the services provided as adviser and as subadviser are "substantially" the same, Defendants have presented uncontroverted evidence that the risk undertaken and scale of services are different. Defendants' expert witness,

Professor Stulz, explained that there are different risks in the different roles of adviser or sub-adviser:

4. I concluded that JPMIM faces substantial risks in its role as adviser to the mutual funds at issue in the above-captioned actions. These risks, which can be categorized as liquidity risks,[11] business risks, operational risks, pricing risks, litigation risks, regulatory risks, and reputational risks, all affect JPMIM's financial health, and therefore must be accounted for when assessing the fees collected by JPMIM.

5. Further, I concluded that the risks faced by JPMIM in its role as adviser differ in type and magnitude from those faced by JPMIM in its role as subadviser such that JPMIM faces greater risk as an adviser. Because a subadviser faces a different risk profile than an adviser, the fees collected in each role are not directly comparable. An analysis of the fees of an adviser or a subadviser would be incomplete without assessing the relevant risks faced by each.

6. Advisers and subadvisers have different responsibilities. Because they have different responsibilities, they are exposed to different risks. As a subadviser, JPMIM is shielded from certain risks and is able to share costs associated with certain risks with a fund's adviser.

7. The increased exposure to risk JPMIM faces as an adviser decreases its expected profitability for several reasons.

8. First, JPMIM must set up and run the operational infrastructure required to manage these risks.

---

[11] Professor Stulz provided an explanation of liquidity risks in Paragraph 32 of her expert report:

One of the important attributes of mutual funds is daily liquidity. As mentioned above, open-end mutual funds (such as the At-Issue Funds) have to redeem shares daily for investors who want to redeem. If a day's inflows do not cover that day's outflows, the fund risks having to sell securities or otherwise adjust the portfolio to honor the redemption requests. To help manage this risk, advisers, on behalf of funds, hold some assets in cash and/or highly liquid assets, maintain contingent sources of cash in the form of lines of credit, and/or have the ability to borrow from other funds in a complex. Liquidity risk also forces advisers to pay more attention to the liquidity of the fund's assets and to monitor inflows and outflows more closely than would typically be the case for the subadviser of a non-retail fund. Stulz, ECF No. 117-5, Ex. 1, at pp. 9-10, ¶ 32.

9. Second, when these risks materialize, the financial repercussions directly affect JPMIM's profitability and may have an impact on the profitability of other businesses of JPMorgan Chase & Co.

10. Third, because financial institutions have to hold more capital to support these risks, they incur an opportunity cost, as they are not able to deploy that capital elsewhere. Just like other financial institutions, as JPMIM is exposed to more risk, JPMorgan Chase & Co. has to hold more capital – in part because regulators requires it to do so and in part because a company's value will decrease if it is financially fragile. For a given amount of allocated capital, JPMIM faces limitations in taking on additional risks because there is only so much risk that an institution can bear without endangering its financial stability. Therefore, the additional risk of taking on the adviser role may preclude JPMIM, or more generally, JPMorgan Asset Management, Holdings Inc., from starting valuable but risky projects.

11. Fourth, a financial institution's risk exposures can lead to higher funding costs as its debt and equity may become riskier. If investors view a company as risky, they will require higher rates of return on their investments. Therefore, in order to attract investors, higher risk would lead to higher rates for debt financing and a higher required expected return for equity investors.

12. The fees collected by JPMIM in its role as adviser help compensate it for the costs involved in managing these risks on behalf of the fund and for bearing additional risks itself.

13. Any comparison between the fees that JPMIM charges as an adviser and as a subadviser would be incomplete and unusable if it did not fully consider the substantial differences in risks borne by JPMIM when it acts as an adviser and when it acts as a subadviser.

(Stulz Decl., ECF No. 117-5, at pp. 2-3.)

Plaintiffs' expert witness, Professor Ayres, acknowledged that JPMIM assumed "a variety of different risks" in its two roles as adviser and subadviser, including risks identified by Professor Stulz. (David Decl., Ex. 24 (Ayres Tr.) at 87:23-88:16.) Further, Defendants have provided evidence that there are differences in the services provided to subadvised funds. As an example of some of the differences in services, Defendants assert that JPMIM provided substantially more compliance services in both "scale" and "scope" to the Funds, as compared to

16

the Subadvised Funds. (*Def. Mem. Opp. Partial S.J.*, ECF No. 117, at p. 15.) In her expert report, Professor Stulz explained that some of the subadvisory agreements are explicit about the fact that the compliance obligations of the subadviser differ from those of the adviser. As an example, she notes that the Voya agreement has the following clause:

> The Subadviser and the Adviser acknowledge that the Subadviser is not the compliance agent for the Portfolio, and does not have access to all of the Company's books and records necessary to perform certain compliance testing.

(Stulz Decl., Ex. 1, Stulz Report, p. 21, ¶ 71.)

Additionally, Joseph Bertini, the former Chief Compliance Officer of the JPMorgan Funds, testified at deposition that the Adviser provides more compliance services:

> Q. Okay. Were the compliance services provided to the JP Morgan funds and to the sub-advised funds similar in scope?
>
> A. No . . .
>
> Q. Were the compliance services provided to the JP Morgan funds and the sub-advised funds similar in scale?
>
> A. No.
>
> Q. Were there compliance services provided to the JP Morgan funds that were not provided to the sub-advised funds?
>
> A. Yes.
>
> Q. With respect to a sub-advised fund, is there anyone other than JP Morgan Investment Management that has responsibility for providing compliance services to the sub-advised fund?
>
> A. The compliance group of the advis[e]r to the funds would also provide compliance services to those funds.

(*Id.*, citing David Decl., ECF No. 117-4, Ex. 22 (Bertini Tr.) at 130:21 – 131:19.)

Defendants also provided testimony concerning differences in shareholder services provided by JPMIM depending on whether JPMIM's function was as adviser or subadviser. For

example, Maria Connolly, the client portfolio manager for the Mid Cap Value Fund, explained the difference in client services:

> Q. Is that the portfolio manager who was involved in making the investments for a particular fund?
>
> A. Yes.
>
> Q. Or for a particular strategy, correct?
>
> A. Yes, exactly.
>
> Q. That strategy could be the strategy for JP proprietary funds or for subadvised funds, correct?
>
> A. Yes. The cash situation for proprietary funds is a whole different animal. So, you know, yes, Jonathan is making investment decisions for both, but the process I just described would be for institutional accounts and subadvisory accounts, which I consider part of institutional. The funds, it's a whole different process, because obviously there is thousands and thousands of shareholders, and it's a very different process for managing the cash in those proprietary funds.
>
> . . . .
>
> Q. How often do you or your team meet with investors of the J.P. Morgan funds?
>
> A. It depends on how you define "investors." So if you are looking at all the meetings we have with investors of the funds, I mean, literally I have hundreds of meetings every year with investors of the funds . . .
>
> . . . .
>
> Q. Do you or your team have any communication with shareholders of the subadvised Mid Cap Value Funds or the Value Advantage Fund?
>
> A. We don't.

(David Decl., Ex.21 (Connolly Tr.) 48:3-49:9; 63:20-24; 74:10-75:9.)

Defendants further assert that a proper comparison of fees is not between what the Adviser charges the Funds versus what the Adviser charges other funds when it acts as a subadviser, because, in those instances, the subadviser's fee is just a part of the fee charged by

that fund's adviser. As an example, Defendants cite Plaintiffs' Appendix 3, which lists the subadvisory fee for the Columbia VP – Partners Core Bond Fund as 0.12%. "That rate is the subadvisory fee the fund's Sponsoring Adviser paid JPMIM, not the 0.44% advisory fee that the fund paid its Sponsoring Adviser in the fiscal year ending 2015." (*Def. Mem. Opp. Partial S.J.*, ECF No. 117, p. 5, n. 12.) Thus, Defendants assert that "Plaintiffs have not presented any evidence about 'the investment advisory fees that JPMIM charges other, independent mutual funds,' but only evidence of what JPMIM charges the Sponsoring Advisers, which are not mutual funds but instead are institutional clients." (*Id.* at p. 5.) To illustrate their position that these fees are not comparable, Defendants provide charts showing the subadvisory fees paid to JPMIM by Sponsoring Advisers, in comparison to the fee the Sponsoring Adviser receives from its fund. *See* ECF No. 113-1, Appendix E. For example, when serving as a subadviser for the Pacific Select Fund Value Advantage Portfolio, JPMIM receives 0.36% on all AUM, whereas the fund Advisor receives 0.66%. *Id.* Consequently, Defendants conclude that Advisers are paid higher fees than subadvisers, because their roles are not the same.

Giving the above comparisons the weight they merit as *Jones* requires, the Court concludes that Plaintiffs have not "show[n] that the fees [charged by JPMIM] are beyond the range of arm's-length bargaining." *Jones*, 559 U.S. at 350, & n.8, citing 15 U.S.C. § 80a–35(b)(1). The Court considers, by way of analogy, what is required to establish comparability in employment discrimination cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The Sixth Circuit has held that, in the employment context, to demonstrate that something is comparable, it must be comparable in all relevant respects.

> As further explained in *McDonald v. Santa Fe Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), "the ultimate . . . question as we indicated in *McDonnell Douglas,* [is whether] an allegation that 'other employees involved in

19

> acts against (the employer) of *comparable seriousness* . . . were nevertheless retained. . . .' " *Id.* at 283 n. 11, 96 S.Ct. 2574 (emphasis in original).
>
> As this Court held in *Mitchell,* the employees to whom the plaintiff seeks to compare himself must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 964 F.2d at 583. As further explained in *Ercegovich,* the plaintiff is required to "demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." 154 F.3d at 353 (emphasis in original).

*Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). While there may be some similarities and some differences between comparators, at a minimum, in the case at bar, and sufficient for this motion, Plaintiffs must demonstrate that the fees they wish to compare are similar in material respects. The Court concludes that the comparisons in this instance are not materially similar and cannot create a genuine issue of material fact.[12]

### b. *Claims against the Administrator*

Defendants also assert that "the undisputed facts show that Plaintiffs do not have any evidence to support either of their two premises for asserting that the Funds' administration fees were somehow excessive – a comparison to the fees charged by other administrators and the contention that the Administrator's services duplicated services from other providers." (*Def. Mot. S.J.*, ECF No. 113, p. 19.) In their Complaints, Plaintiffs allege that three entities, JP Morgan Chase Bank, N.A. (an affiliate of the Adviser and Administrator), State Street Bank & Trust Co., and U.S. Bancorp Fund Services, LLC (collectively, "comparison entities") provided administration services to mutual funds for lower fees than the Funds paid. Defendants posit that the comparisons are not apt, because "undisputed evidence shows that the Administrator provided services different from the services specified in those contracts." (*Def. Mot. S.J.*, ECF

---

[12] Based upon this conclusion, the Court has no reason to address whether the contracts offered as a comparison have been properly offered under Fed. R. Civ. P. 56(c)(2).

No. 113, p. 21.)  Defendants provide evidence that the Administrator provided "a number of services to the Funds that the Comparison Entities do not provide in their contracts," including, among other things:

- Overseeing the Funds' other service providers, including negotiating and administering their contracts, overseeing and reviewing their performance, and reporting to the Board about those service providers and their performance.

- Assisting with the design, development, and operation of the Funds, including proposing new share classes and structures for the Board's consideration.

- Drafting amendments to the Funds' governing documents.

- Supplying individuals to serve as officers to the Funds, subject to the Board's approval.

(*Def. Mot. S.J.*, ECF No. 113, p. 19, citing ECF No. 113-2, Shlissel Decl. ¶ 7.)

Plaintiffs provide evidence that they maintain shows that the Comparison Entities offer similar services. (*Pl. Mem. in Opp.*, ECF No. 118 p. 27, n. 64-66) (citing Boyle Aff. and Exs.). Plaintiffs also assert that the Administrator charged the Funds a disproportionately large fee "because the services of the Administrator provided 'overlap[ped]' with services provided by other service providers to the Funds, so that the Funds paid 'duplicative fees.'" (Goodman Compl. ¶ 151; Campbell Compl. ¶ 153.) The allegation of "overlapping" services is addressed by Brian Shlissel, Head of U.S. Funds Platform Management and President of JP Morgan Funds in his declaration:

13.    I understand that paragraphs 157 and 159 of the *Goodman* amended complaint and paragraphs 159 and 161 of the *Campbell* complaint allege that the Administrator's responsibilities regarding (i) preparing shareholder communications, (ii) coordinating the mailing of prospectuses and certain Fund reports, and (iii) supervising the preparation of filing of Blue Sky filings overlap with services provided by the Funds' Transfer Agent, Boston Financial Data Services ("BFDS"). Again, the actual services provided are different. The Administrator oversees and coordinates the creation of prospectuses and shareholder reports, while the Transfer Agent has responsibility for delivery of certain communications,

including prospectuses and shareholder reports. The Administrator oversees the preparation of Blue Sky filings with state authorities; the Transfer Agent provides certain data in connection with those filings. In addition, the Administrator has contracted with BFDS, at the Administrator's expense, to provide additional services related to Blue Sky filings. It is my understanding that BFDS does not provide these additional services in its role as Transfer Agent to the Funds.

(Shlissel Decl., ¶ 13.)

Defendants assert that Plaintiffs have no admissible evidence that any of the Comparison Entities provided any of these additional services. (Def. Mot. S.J., ECF No. 113, p. 22, citing Shlissel Decl., ¶¶ 7 -13. On the other hand, Plaintiffs assert that they proffered evidence, including the report and testimony of their expert, Francis Vitagliano. (*Pl.'s Mem. Opp.*, ECF No. 118, at pp. 26-27, and n. 64-67.) Mr. Vitagliano opined in his report that "[o]ther unaffiliated mutual fund administration companies, such as State Street Bank & Trust Company ("State Street") and U.S. Bancorp Fund Services ("U.S. Bank"), also offer administration services at fee rates substantially below those charged by Defendants to the At-Issue Funds." (Boyle Ex. 14, ECF No. 119), Vitagliano Report, at p. 9. He further opined that the administration services provided by subadministrator JPMCB were the "same or substantially the same" as the services to the Funds. *Id.*

Mr. Vitagliano testified at deposition about the similarities of administrative services provided to the Funds and the subadvised funds, and acknowledged that there are some differences:

Q. Should a mutual fund always hire the mutual fund administrator that charges the lowest fee?

A. Not necessarily.

Q. Why not?

A. That particular administrator might be sitting in India, Western China, Siberia, sitting in foreign countries. You might not want to deal with that. You wouldn't want to deal with an administrator that has a reputation -- is probably domiciled within the US, has been around today and for years and in the future, and has a reputation for providing exceptional quality service at very reasonable market rates.

Q. So do different mutual fund administrators in some cases provide different quality of services?

A. Again, the ones, I believe, in India and Western China have probably lower quality services, as I understand it. But in the United States, as the industry has consolidated, the main players are providing generally the same quality service from my experience in the industry.

. . . .

Q. Are there any services provided under the administration agreement, Vitagliano 3 --

A. Right.

Q. -- that are not provided under the JPMCB agreement with the ProShares funds?

A. If I remember correctly, some of the services having to do with -- could be the filing of some of the forms. There are four forms. And there is a difference between one entity and the other between actually preparing and filing, and the other one was fundamentally preparing.

Q. Anything else?

A. No. That was the main one that appeared to me, that was highlighted to myself in my analysis.

Q. Okay. So I'm going to ask you the same question about the services provided under the administration agreement, Vitagliano 3, and the services provided by JPMCB to the EQ fund under that agreement.

A. And I think under the EQ funds agreement versus the ones provided to the at-issue funds, again what highlighted to me there was the differential in those four -- there may be a fifth form filing -- the issue is whether or not they actually file versus prepare all the information for filing.

Q. Anything else?

A. That's the – that's what I recall at this time.

(Boyle Ex. 33, Vitagliano Tr., 80-81, 183-185.)

Assuming *arguendo* that the evidence presented by Plaintiffs is admissible, which Defendants dispute, the Court has given it the weight it merits in light of the similarities and differences between the services and the clients in question. The differences in the comparison evidence are material and, even when viewing the evidence in the light most favorable to Plaintiffs, the evidence is insufficient to raise any issue of material fact as to this *Gartenberg* factor.

### 2. *Economies of Scale*

Plaintiffs posit that "[m]utual fund investment advisers, such as JPMIM, realize economies of scale because the work or cost required to provide investment advisory services to a mutual fund does not increase proportionately as the amount of assets invested in the funds increases." (*Pl. Mem. Opp.*, ECF No. 118, p. 21.) However, they assert that "[t]here has been no reduction in the gross advisory fee charged to the fund shareholders because none of JPMIM's investment advisory fee schedules for the Funds include breakpoints, and the net advisory fees have changed little."[13] (*Id.*) Defendants contend that this assertion cannot apply to the three Bond Funds, inasmuch as Plaintiffs' expert, Professor Ayres, explained that "the assets of the Bond Funds have not increased in recent years, and thus the Adviser did not realize any economies of scale in managing those Funds." (*Def. Mot. S.J.*, ECF No. 113, p. 18.) Furthermore, Defendants assert that Professor Ayres also acknowledged that, "to the extent the Adviser realized any economies of scale from managing the Equity Funds, the Adviser did share those economies with the Funds through fee waivers." (*Id.* at pp. 18-19.) In his deposition,

---

[13] "Although breakpoints may be an appropriate way for investment advisers to ensure that the benefits of achieving economies of scale are shared with the Fund and its investors, it is by no means the only way of doing so." *Pirundini v. J.P. Morgan Investment Management, Inc.*, No. 17-cv-3070, 2018 U.S. Dist. LEXIS 25315, at n.12 (S.D.N.Y. Feb. 14, 2018).

Professor Ayres opined that the Funds did share economies of scale, but the sharing was "not sufficient to stop the profit rates from increasing."

> Q. Okay. So let's focus on the three equity funds where you did find evidence that JPMIM was realizing economies of scale. Did you find any evidence that J.P. Morgan Investment Management was sharing any of those economies of scale with the at-issue funds?
>
> A. Yes.
>
> Q. What issue was that?
>
> A. Well, as previously testified during this time period, there were changes to some of the fees for some of the at-issue and advised funds. But, importantly, the possible sharing that occurred wasn't sufficient to stop the profit rates from increasing on each of these equity funds as the -- as they increased in size.

(David Decl., ECF No. 82-33, Ex. 3 (Ayres Tr.) 190:6-20.) In considering the question of the role of economies of scale in its analysis of *Gartenberg* factors, the District Court in *Jones I* stated that, "whether breakpoints could have been set at a lower level is not the issue. The issue is whether the board could have agreed to the breakpoints being set at those levels after engaging in good faith negotiations. There is no indication that they could not . . . ." *Jones I*, 2007 WL 627640, at *9. Similarly, here there is simply no indication that the Board could not have agreed to the level of fee waivers after engaging in good faith negotiations.

### 3. The Funds' Fees and Performance

Plaintiffs do not allege that the Funds performed poorly. Rather, they contend that the Funds were exceedingly profitable; too profitable for their fee contracts to be the product of arm's length negotiations. Plaintiffs assert that there is a "large disparity between the investment advisory fees charged and the costs incurred by JPMIM to provide those services. The result is extremely high profit margins exceeding 80% in some instances." (*Pl. Mem. Opp.*, ECF No. 118, p. 3.) In support of their claim of excessive profits, Plaintiffs assert that Professor Ayres'

expert report "analyzed the cost data included in these profitability reports and shows that JPMIM's costs are comparable, if not lower, for the Funds than the Subadvised Funds. In the few instances where JPMIM's costs (including distribution expenses) are greater for the Funds than the Subadvised Funds, the differences are too small to justify the difference in fees charged." (*Pl. Mem. Opp.*, ECF No. 118, p. 16.)

Defendants respond that, "[f]or their services, the Adviser and Administrator each received a fee that was calculated monthly based upon a percentage of each Fund's net assets under management."[14] (*Def. Mot. S.J.*, ECF No. 113; ECF No. 82, pp. 7-8.) These fees are disclosed in each Fund's prospectus and other SEC filings, and are approved by the Board. Furthermore, "[e]ach year, the Adviser and Administrator agreed to waive portions of the fees to which they were entitled under the relevant contracts, resulting in actual fees below the rates set forth in the agreements." *Id.* at p. 8.

> For the fiscal years ended in 2015, for example, the actual investment advisory fee rate for the Funds ranged from 0.26% to 0.62%; the actual administration fee rate for the Funds ranged from 0.044% to 0.082%.

*Id.*

Defendants provide two charts depicting in detail the value of the fee waivers for each of the Funds at issue. Appendix A is a chart that compares the Funds' Gross Advisory Fees with the Actual Advisory Fees (After Waivers); Appendix B is a chart that compares the Funds' Gross Administration Fees with the Alleged Actual Advisory Fees (After Waivers).[15]

---

[14] Thus, as the amount of assets under management increases, the annual fees increase. For example, as a result of the increase in AUM, Plaintiffs assert that the amount of investment advisory fees paid by the Mid Cap Value Fund increased over several years by more than 154%, from less than $38.2 million in fiscal year 2008 to more than $97 million in fiscal year 2015. (*See Campbell Compl.*, ¶ 103.)

[15] *See* ECF No. 113-1, Appendix A, Appendix B.

As an example, for the Core Bond Fund listed first in Appendix A, the gross advisory fee as alleged in *Goodman* Compl. ¶62 was $67,153,000. Defendants assert that $8,528,000 of the fee was waived, thus reducing the Gross Advisory Fee from 0.30% to an Actual Advisory Fee of 0.26%. The charts provided at Appendix A and Appendix B are set forth in their entirety as follows:

### Appendix A: Gross &Actual Advisory Fees

| Fund | Gross Advisory Fee | Actual Advisory Fee (After Waivers) Fiscal Year Ended 2/28/2015 |
|---|---|---|
| Core Bond Fund | 0.30%[1] | 0.26%[2] |
| High Yield Fund until 11/1/16 | 0.65%[3] | 0.62%[4] |
| High Yield Fund as of 11/1/16[5] | 0.60%[6] | - |

| Fund | Gross Advisory Fee | Actual Advisory Fee (After Waivers) Fiscal Year Ended 6/30/2015 |
|---|---|---|
| Mid Cap Value Fund | 0.65%[7] | 0.60%[8] |
| Large Cap Growth Fund | 0.50%[9] | 0.48%[10] |
| Value Advantage Fund | 0.65%[11] | 0.61%[12] |

[1] As alleged in *Goodman* Compl. ¶ 62.

[2] Calculated as gross advisory fee as alleged in *Goodman* Compl. ¶ 62 (0.30%) multiplied by ratio of paid advisory fees ($67,153,000) to sum of paid advisory fees ($67,153,000) plus waived advisory fees ($8,528,000). *See* David Decl. Ex. 1 (2015 Trust II SAI, at Part I-23).

[3] As alleged in *Goodman* Compl. ¶ 64.

[4] Calculated as gross advisory fee as alleged in *Goodman* Compl. ¶ 64 (0.65%) multiplied by ratio of paid advisory fees ($64,126,000) to sum of paid advisory fees ($64,126,000) plus waived advisory fees ($4,205,000). *See* David Decl. Ex. 1 (2015 Trust II SAI, at Part I-23).

[5] Effective November 1, 2016, the High Yield Fund's gross advisory fee was reduced to 0.60%. *See* David Decl. Ex. 7 (Schedule A, at 1).

[6] David Decl. Ex. 7 (Schedule A, at 1).

[7] As alleged in *Campbell* Compl. ¶ 68.

[8] Calculated as gross advisory fee as alleged in *Campbell* Compl. ¶ 68 (0.65%) multiplied by ratio of paid advisory fees ($95,897,000) to sum of paid advisory fees ($95,897,000) plus waived advisory fees ($7,617,000). *See* David Decl. Ex. 2 (2015 Trust II SAI, at Part I-29).

[9] As alleged in *Campbell* Compl. ¶ 68.

[10] Calculated as gross advisory fee as alleged in *Campbell* Compl. ¶ 68 (0.50%) multiplied by ratio of paid advisory fees ($76,364,000) to sum of paid advisory fees ($76,364,000) plus waived advisory fees ($555,000). *See* David Decl. Ex. 2 (2015 Trust II SAI, at Part I-29).

[11] As alleged in *Campbell* Compl. ¶ 68.

[12] Calculated as gross advisory fee as alleged in *Campbell* Compl. ¶ 68 (0.65%) multiplied by ratio of paid advisory fees ($58,747,000) to sum of paid advisory fees ($58,747,000) plus waived $4,225,000). *See* David Decl. Ex. 2 (2015 Trust II SAI, at Part I-30).

### Appendix B: Gross & Actual Administration Fees

| Fund | Gross Administration Fee[13] | Alleged Actual Administration Fee (After Waivers) Fiscal Year Ended 2/28/2015[14] |
| --- | --- | --- |
| Core Bond Fund | 0.08% | 0.056% |
| High Yield Fund | 0.08% | 0.048% |
| Short Duration Bond Fund | 0.08% | 0.044% |

| Fund | Gross Administration Fee[15] | Alleged Actual Administration Fee (After Waivers) Fiscal Year Ended 6/30/2015[16] |
| --- | --- | --- |
| Mid Cap Value Fund | 0.08% | 0.055% |
| Large Cap Growth Fund | 0.08% | 0.082% |
| Value Advantage Fund | 0.08% | 0.063% |
| U.S. Equity Fund | 0.08% | 0.081% |

[13] Defined in Administration Agreement as 0.15% of the first $25 billion of average daily net assets of all Category 1 and Category 4 funds in the JPMorgan Funds Complex (defined as all Funds subject to the Administration Agreement) plus 0.075% of average daily net assets of all Category 1 and Category 4 funds over $25 billion. Shlissel Decl. Ex. 1 (Administration Agreement, Schedule B, at 12-13).

[14] *Goodman* Compl. ¶ 119.

[15] Defined in Administration Agreement as 0.15% of the first $25 billion of average daily net assets of all Category 1 and Category 4 funds in the JPMorgan Funds Complex plus 0.075% of average daily net assets of all Category 1 and Category 4 funds over $25 billion. Shlissel Decl. Ex. 1 (Administration Agreement, Schedule B, at 12-13).

*Campbell* Compl. ¶121.

Defendants further assert that Lipper, one of the most commonly used sources to measure fees and performance in the mutual fund industry, and an independent provider of data unaffiliated with any fund sponsor, prepared reports that were provided to the Board in connection with its annual contract review process for the Funds. These reports compared each Fund's performance and "management fees" (which are the sum of the Fund's advisory and administration fees) to a universe of similar funds. Lipper uses rankings and quintiles to characterize the fees for each Fund relative to its comparative set, with the first quintile comprising the lowest fees, and the fifth quintile comprising the highest fees. (*Def. Mot. S.J.*, ECF No. 113, p. 8, citing Shlissel Decl., Ex. 4.)

> According to Lipper, the fees paid by the Funds were in line with the fees paid by similar funds. For six of the seven Funds – the Core Bond Fund, the Short Duration Bond Fund, the Large Cap Growth Fund, the Value Advantage Fund, the Mid Cap Value Fund, and the U.S. Equity Fund – the management fees were in line with, and often the least expensive among those of similar funds. The management fees for the High Yield Fund were above average for comparable funds, but the High Yield Fund's total expenses (which include all fees) were in line with those of comparable funds.

(*Def. Mot. S.J.*, ECF No. 113, p. 9, citing Shlissel Decl. Ex. 4, Appendix C1 (Lipper Expense Data) and Appendix C2 (Lipper Performance Data).) Defendants assert that it is also undisputed that the Funds delivered strong performance.

> Similar to its fee comparisons, Lipper prepared reports for the Board comparing each Fund's performance to a universe of similar funds over multiple time horizons. The performance comparisons also use rankings and a quintile system, with the first quintile comprising the best performing funds, and the fifth quintile comprising the poorest performing funds. According to Lipper, all seven of the funds outperformed the median of comparable funds, especially over longer periods of time.

(*Id.*)

Plaintiffs assert that "it is improper to assume that the fees charged to the funds in JPMIM's Lipper 'peer groups' are negotiated at arm's length where Defendants have not even attempted to make such a showing." (*Pl. Mem. Opp.*, ECF No. 118, p. 22.) They further assert that, "unlike in *Jones II*, Plaintiffs here contest that the so-called 'comparable funds' are, in fact, comparable." (*Id.* at p. 23.) However, in the case at bar it is Plaintiffs' burden to show that the fees are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. This burden does not belong to Defendant. Plaintiffs have provided no evidence to support their contention that the comparators used by the Lipper reports are not relevant. Both Defendants' and Plaintiffs' expert witnesses explained that Lipper reports are used in the industry and that they have used Lipper data.[16] While the Court does not rely upon the Lipper analysis alone, the Board's consideration of Lipper expense and performance data comparing mutual funds is among the "pertinent facts" to be weighed in determining whether fees are "so disproportionately large" that they bear no reasonable relationship to the services provided.

> According to Lipper, the fees paid by the Funds were in line with the fees paid by similar funds. For six of the seven Funds – the Core Bond Fund, the Short Duration Bond Fund, the Large Cap Growth Fund, the Value Advantage Fund, the Mid Cap Value Fund, and the U.S. Equity Fund – the management fees were in line with, and often the least expensive among, those of similar funds. The management fees for the High Yield Fund were above average for comparable funds, but the High Yield Fund's total expenses (which include all fees) were in line with those of comparable funds.

(*Def. Mot. S.J.*, ECF No. 113, p. 9, citing Shlissel Decl., Ex. 4, Appendix C1 (Lipper Expense Data), Appendix C2 (Lipper Performance Data).)

---

[16] *See* Shlissel Decl. ¶¶ 16-17. Plaintiffs' expert, Professor Ian Ayres, testified that, although he did not wish to testify to its "general reliability," he has used Lipper data. *See* David Decl., Ex. 3, ECF No. 113-33 (Ayres Tr. 209:25-213:2).

Defendants set forth a summary of the performance of the Funds in comparison to their Lipper universes taken from the Lipper Expense and Performance Data in Appendix C1 and Appendix C2 cited above:

> The performance of all seven Funds has been superior. For the ten-year periods ending in 2013, 2014, and 2015, all seven Funds consistently performed in the first (best) or second quintiles of their respective Lipper Performance Universes. For example, in 2015, on a ten year basis, the Core Bond Fund outperformed 232 of the 283 comparable mutual funds in its Lipper Performance Universe, the High Yield Fund outperformed 244 of 287 comparable funds, the Short Duration Bond Fund outperformed 38 of 49 comparable funds, the Mid Cap Value Fund outperformed 328 of 350 comparable funds, the Large Cap Growth Fund outperformed 336 of 382 comparable funds, the Value Advantage Fund outperformed 148 of 154 comparable funds, and the U.S. Equity Fund outperformed 488 of 510 comparable funds.

(*Def. Mot. S.J.*, ECF No. 113, pp. 14-16.)

Defendants have presented undisputed evidence that, among mutual funds, the Funds' fees fall within the range of those comparators, and are not "disproportionately large." Additionally, Defendants have shown that the Funds' performance is generally favorable, and certainly within a "range of acceptable results." *See Jones I, 2007* WL 627640, at *7.

#### 4. *The Board of Directors*

The Supreme Court stated in *Jones* that "[i]t is also important to note that the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 559 U.S. at 352. However, Plaintiffs contest the deference that should be given to the Board's approval of the IAA's for the Funds. (*See Pl. Mem. Opp.*, ECF No. 118, p. 32-33.) Plaintiffs seek to discount the Board's decision making process, asserting that "[h]ere, the Court should give minimal, if any, deference to the Board's approval because Defendants failed to provide accurate and complete information to permit the Board to become fully informed about the advisory and administration fees charged to the Funds." (*Pl. Mem. Opp.*,

ECF No. 118, pp. 32-33.) Specifically, Plaintiffs assert that, "[p]rior to the filing of this lawsuit, Defendants did not provide the Board any analysis of the fees JPMIM charges or the services it provides as subadviser to independent mutual funds. Instead, JPMIM categorized 'subadvisory relationships' as one of several types of 'institutional accounts' (like a pension fund)." (*Id.* at p. 33.)

Defendants assert that "[t]he Trustees who served on the Board during the relevant period were both experienced and 'independent' from the Adviser and Administrator, meaning they were not 'interested persons' of the Advisor or the Funds under the ICA," and the Board "engaged in a robust approval process that is well documented." (*Def. Mot. S.J.*, ECF No. 113, pp. 10-11.) The Board meets quarterly with independent auditors of the Funds, and each year the Board met several times to review information it had requested and received from the Adviser, the Administrator, and independent third parties. *Id.*

> 15. Each year the Board reviews the contracts with a number of the Funds' service providers, including for example the Funds' Adviser and the Funds' Administrator, including the fees paid pursuant to those contracts. The annual meeting at which the Board formally considers the contract renewals is referred to as the "Section 15(c) meeting."

> 16. In connection with each Section 15(c) meeting since I became Head of U.S. Funds Platform Management, the Board has received information and materials from (i) its own independent counsel from the law firm Kramer Levin, (ii) the Funds' Senior Officer and Chief Compliance Officer—who provided additional, independent assessments of the reasonableness of the management fees charged to the Funds, (iii) Thompson Reuters Lipper—an independent provider of mutual fund fee and performance data, and (iv) Casey Quirk—another independent provider of mutual fund performance data. The Kramer Levin lawyers who serve as counsel for the Independent Trustees now practice with the law firm Perkins Coie. In addition, PricewaterhouseCoopers ("PwC"), the Funds' independent auditors, meets with the Board quarterly and provides the Board with information.

(Shlissel Decl., ¶¶ 15-16.) Furthermore, Defendants contend that, "[e]ach year, as a result of negotiations with the Board, the Adviser and Administrator agreed to waive millions of dollars in

32

advisory fees and administration fees that the Funds otherwise would have owed under the applicable agreements." (*Def. Mot. S.J.*, ECF No. 113, pp. 11-12.)

Ultimately, Plaintiffs have pointed to no irregularities or deficiencies in the Board's conduct, nor do they allege that the Board completely failed to consider the fees of subadvisory and subadministrative contracts. Rather, they assert that the form in which the Board received information about subadvisory and subadministrative services was provided as "one of several types of 'institutional accounts' (like a pension fund)." (*Pl. Mem. in Opp.*, ECF No. 118 at p. 33.) The Supreme Court explained in *Jones* that, where "the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." *Jones*, 559 U.S. at 351. Here, there is no evidence to support a finding that the Board failed to engage in a robust approval process for the Funds' IAAs.

To counter the effect of the evidence Defendants have provided, Plaintiffs "must demonstrate that the "flaws they find in what transpired would have made a legally significant difference." *Jones I*, 2007 WL 627640, at *9. However, the evidence Plaintiffs have adduced establishes at most that others paid different amounts for fewer services. It does not allow a reasonable inference that the amounts paid to the Funds were outside of the range that could be expected to result from arm's length bargaining. Section 36(b) does not create a duty that advisers and administrators receive the lowest possible fee amount as compensation for the services they provide. What matters is whether, in light of all of the pertinent factors as identified by the Supreme Court in *Jones*, there is such a disconnect between what the Funds were paid, and what the services were worth, that the fees could not have been the product of

arm's length negotiations. Consequently, here the Board's approval is entitled to considerable weight.

### 5. Conclusion – Summary Judgment

Based on the foregoing, the Court concludes that Plaintiffs have not set forth issues of fact that, if resolved in their favor, could lead to a finding that Defendants had breached their § 36(b) duty. Accordingly, Defendants are entitled to summary judgment in their favor.

## IV.  MOTIONS TO SEAL

In its September 29, 2017 Order (ECF No. 109), the Court granted the parties' Joint Motion for Leave to File Dispositive Motions and Exhibits Under Temporary Seal (ECF No. 108), and ordered the parties to file, within fourteen (14) days of filing reply memoranda, a joint motion or separate motions for leave to permanently seal only the necessary Confidential information that was filed temporarily under seal pursuant to this Order, and thereafter to file redacted copies of the filings.

In accordance with the Court's Order (*Goodman*, ECF No. 109, and *Campbell*, ECF No. 78), Defendant JPMIM, on its own behalf and as successor-in-interest to Defendant JPMFM, moved (ECF No. 126) to permanently seal or redact selected documents listed on Appendix 1 to the Motion to Seal. JPMIM's motion is joined by two non-parties, SEI Investments Management Corporation ("SEI") (ECF No. 130), and SunAmerica Asset Management, LLC ("SunAmerica") (ECF No. 131) (the "non-parties"), who, under protective order and having designated the information as Confidential, complied with Plaintiffs' subpoenas to provide confidential, nonpublic fee information. The non-parties specifically request redactions to fee schedules that are part of the submissions attached to Wilson Decl., Ex. 25, 30, and 31. SEI seeks to redact the fee schedules located in Schedule B to Wilson Decl., Ex. 30 (SIMCJPMIM00000015; SIMC-

JPMIM-00000004) and Schedule B to Wilson Decl., Ex. 31 (SIMCJPMIM00000044; SIMC-JPMIM00000017). SunAmerica seeks to redact the fee schedules located in Schedule A to Wilson Decl., Ex. 25 (SAAM_0001862) and in Amendment No. 6 to Wilson Decl., Ex. 25 (SAAM_0001843; SAAM_00018423). The nonparties have provided extensive justification for redacting this confidential information. Furthermore, the nonparties have been granted exemptions from the Securities and Exchange Commission such that the fees at issue are filed publically as part of an aggregate number only, and have operated under this exemption for years. (Buser Decl., ECF No. 130-1; Bressler Decl., ECF No. 131-1.) This Court finds that the materials are confidential and proprietary. The documents are ordered to remain under seal.

JPMIM seeks to seal 47 documents and redact 28 others. All but 4 of the documents that JPMIM seeks to seal or redact were filed by Plaintiffs, who oppose the motion (ECF No. 128.) Defendants assert that this motion has become necessary in the course of this litigation:

> In fact, it is Plaintiffs' failure to observe the local rules of this Court that now requires JPMIM to seek to either seal or redact many of the documents that are the subject of its Motion to Seal. Under Local Civil Rule 7.2(e), "[e]vidence submitted, including discovery documents, shall be limited to that necessary for decision and shall include only essential portions of transcripts or exhibits referenced in the memorandum." Plaintiffs ignored this Local Civil Rule, filing voluminous exhibits in their entirety instead of excerpting only the "essential portions." Plaintiffs should not be allowed to abuse the litigation process and harm JPMIM and third parties by injecting their public court filings with highly confidential and irrelevant information.

(*Reply Memorandum of Law in Further Support of Motion to Seal*, ECF No. 129, at p. 1.)

Defendants further assert that the sealed or redacted documents represent a small number of the many documents associated with the dispositive motions, that those documents contain the nonpublic, confidential information of JPMIM (or its employees, affiliates, or experts), the J.P. Morgan Funds, or the J.P. Morgan Funds' service providers, and that public disclosure of this information would result in competitive harm, by disclosing information that a competitor could

use to gain an unfair advantage, or another type of harm. JPMIM asserts that it has requested the narrowest possible seal necessary to prevent the substantial risk of harm from materializing. In proposing that certain materials be sealed or redacted, JPMIM asserts that it has been careful to ensure that the substance of the parties' arguments would be available to the public. The Court has thoroughly reviewed the documents in Appendix 1 and the supporting affidavits, and finds that the types of information that JPMIM seeks to protect fall into 7 categories: (1) confidential profitability information, (2) confidential information regarding subadvisory business relationships, (3) confidential compliance information, (4) confidential business strategy information provided to the Board of Trustees/Directors of the J.P. Morgan Funds (the "Board"), (5) confidential information provided by JPMCB to the Board, (6) confidential proprietary information of the Board, and (7) confidential personal and miscellaneous information.

"[T]rial courts have always been afforded the power to seal their records when interests of privacy outweigh the public's right to know." *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 474 (6th Cir. 1983). The "'strong presumption in favor of openness'" can be overcome by a compelling reason for non-disclosure. *Shane Grp. Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983)). As Plaintiffs note in their Response to Defendants' Motion to Seal, "[t]he proponent of sealing must . . . 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Shane Grp.*, 825 F.3d at 305-06 (citation omitted)). (*Pl. Response Def. Mot. to Seal*, ECF No. 128, at p. 3). This is exactly what Defendants have done. Plaintiffs do not object to the sealing of the information listed above as number 7, except for the hourly fee rate of Defendants' expert. The Court concurs that the fee rate of Defendants' expert is not the type of confidential information at issue here, and thus

sealing that information is not required. The Court finds that Defendants have provided evidence of compelling reasons for non-disclosure of the specific information listed on Appendix 1, with the exception of the hourly fee rate of their expert witness. With that exception, the Court grants Defendants' Motion to Seal. (ECF No. 126.)

Plaintiffs also wish to seal permanently several confidential filings, and have filed an Unopposed Motion to File Redacted Financial Documents and Partially Seal Filings (ECF No. 125). Pursuant to the Court's Order of September 29, 2017, Plaintiffs move to permit the filing of redacted versions of eight documents containing Plaintiff Jacqueline Peiffer's monthly account statements relating to her J.P. Morgan Securities, LLC, securities brokerage account, and partially seal related documents. Specifically, Plaintiffs request that certain of Ms. Peiffer's financial information contained in records submitted under seal in unredacted form (Brown Decl., Ex. 2-5 and Boyle Decl., Ex. 4) be redacted to preclude public access to her personal financial information. Plaintiffs seek to redact the amounts of Ms. Peiffer's total dollar amounts invested in investments not at issue in the case at bar, and "her account number except for the last three digits (*see* Fed. R. Civ. P. 5.2(a)(4)) as an appropriate identifier between her two accounts." (*Pl. Mot.,* ECF No. 125-1, at p. 3, citing Declaration of Michael J. Boyle, Jr. in Support of Plaintiffs' Memorandum of Law in Support of Their Unopposed Motion to File Redacted Financial Documents, dated December 20, 2017. (Boyle Decl., ECF No. 125-2, Exhibits 1-5)).

Courts have recognized the strong interest in keeping personal financial records from public view. *SMA Portfolio Owner, LLC v. Corporex Realty & Investment, LLC,* Civil Action No. 12-23-DLB-JGW, *et al.,* 2014 WL 12650589 at *3 (W.D. Ky. Apr. 18, 2014) ("Indeed, it is undisputed that a person or entity possesses a 'justifiable expectation' of privacy that their

names and financial records not be revealed to the public.") *citing In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 477 (6th Cir. 1983). *See also Wedgewood Ltd. Partnership I v. Township of Liberty*, Civil Action No. 2:04-CV-1069, 2007 WL 1796089, at *3 (S.D. Ohio June 21, 2007) *citing Knoxville News-Sentinel*, 723 F.2d at 477. For this reason, and for the reasons stated above addressing Defendants' Motion to Seal, the Court finds that Plaintiffs have provided evidence of compelling reasons for non-disclosure of the specific information at issue. Accordingly, the Court grants Plaintiffs' Unopposed Motion to File Redacted Financial Documents and Partially Seal Filings. (ECF No. 125.)

## V. MOTIONS FOR LEAVE TO FILE

Plaintiffs have filed two motions for leave to file certain briefs.

### A. Sur-Reply

Plaintiffs filed a Motion for Leave to File a Sur-Reply in Opposition to Defendants' Motion for Summary Judgment (ECF No. 124), to which Defendants have filed a Response in Opposition (ECF No. 127). The Court grants Plaintiffs' Motion for Leave to File a Sur-Reply and has reviewed the information proffered in the Sur-Reply.

### B. Supplemental Authority

Plaintiffs have filed a Motion for Leave to File Response (ECF No. 133) to Defendants' Notice of Supplemental Authority (ECF No. 132), to which Defendants neither consent nor object, but ask for the opportunity to submit a short response if the Court grants Plaintiffs' Motion. The Court grants Plaintiffs' Motion for Leave to File a Response and has reviewed the information provided in that Response. The Court finds no need to permit Defendants the opportunity to provide a response to Plaintiffs' Motion.

## VI. CONCLUSION

Based on the foregoing reasons, Plaintiffs' *Unopposed Motion to Dismiss Goodman Claim III* (ECF No. 106) is **GRANTED**; Defendants' *Motion to Dismiss, or in the Alternative, for Summary Judgment on, Count II of the Goodman Complaint for Lack of Subject Matter Jurisdiction* (ECF No. 110) is **DENIED AS MOOT**; Plaintiffs' *Motion for Partial Summary Judgment* (ECF No. 111) is **DENIED** (in dispositive part); Defendants' *Motion for Summary Judgment* (ECF No. 113) is **GRANTED**; the Parties' *Joint Request for Oral Argument on Pending Dispositive Motions* (ECF No. 123) is **DENIED**; Plaintiffs' *Motion for Leave to File Sur-Reply* (ECF No. 124) is **GRANTED**; Plaintiffs' *Unopposed Motion to File Redacted Financial Documents and Partially Seal Filings* (ECF No. 125) is **GRANTED**; Defendants' *Motion to Seal* (ECF No. 126) is **GRANTED**; *SEI's Motion to Join* (ECF No. 130) is **GRANTED**; *SunAmerca's Motion to Join* (ECF No. 131) is **GRANTED**; and Plaintiffs' *Motion for Leave to File Response to Defendants' Supplemental Authority* (ECF No. 133) is **GRANTED**.

   **IT IS SO ORDERED.**

3-9-2018
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**